A.T. MASSEY COAL COMPANY, INC., Massey Coal Services, Inc., Peerless Eagle Coal Co., Tennessee Consolidated Coal Corporation, Plaintiffs,

v.

Larry G. MASSANARI, Acting Commissioner of Social Security,

and

Michael H. Holland, Marty D. Hudson, Thomas O.S. Rand, Elliot A. Segal, Carl E. Van Horn, Gail R. Wilensky and William P. Hobgood, as Trustees of the United Mine Workers of America, Defendants,

Michael H. Holland, Marty D. Hudson, Thomas O.S. Rand, Elliot A. Segal, Carl E. Van Horn, Gail R. Wilensky and William P. Hobgood, as Trustees of the United Mine Workers of America, Counterclaim Plaintiffs,

v.

A.T. Massey Coal Company, Inc., Massey Coal Services, Inc., Peerless Eagle Coal Co., Tennessee Consolidated Coal Corporation, Rawl Sales and Processing Co., Omar Mining Co., PM Charles Coal Co., Rocky Hollow Coal Co., Sprouse Creek Processing Co., Big Bear Mining Co., Dehue Coal Co.,

Douglas Pocahontas Coal Corp., Hopkins Creek Coal Co., Joboner Coal Co., Majestic Mining, Inc., Performance Coal Co., Vantage Mining Co., Russell Fork Coal Co., and Vesta Mining Co., Counterclaim Defendants.

No. CIVA 3:88CV83.

United States District Court,
E.D. Virginia,
Richmond Division.

July 19, 2001.

John R. Woodrum, Heenan, Althen & Roles, Washington, D.C., John M. Poma,

Esquire, A.T. Massey Coal Company, Inc., Richmond, VA, for Plaintiffs.

Debra J. Prillaman, Assistant United States Attorney, United States Attorney's Office, Richmond, Richard G. Lepley, Esquire, Brian G. Kennedy, Department of Justice, Civil Division, Washington, DC, for Massanari.

Samuel M. Brock, III, Troutman Sanders Mays & Valentine LLP, Richmond, VA, Charles P. Groppe, Peter Buscemi, Stanley F. Lechner, Morgan, Lewis & Bockius, L.L.P., David W. Allen, UMWA Health & Retirement Funds, John R. Mooney, Mooney Green, Gleason, Baker, Gibson & Saiden, PC, Washington, DC, for Trustees.

## MEMORANDUM OPINION

PAYNE, District Judge.

This action involves the application of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–9722 (the "Coal Act" or the "Act"), to the plaintiff coal companies and the assessment of liability thereunder for healthcare premiums benefitting retired coal miners. The Plaintiffs in this action are: A.T. Massey Coal Company, Inc.; Massey Coal Services, Inc.; Peerless Eagle Coal Co.; and Tennessee Consolidated Coal Co. (collectively "Plaintiffs" or "Massey Plaintiffs").[1] The Defendants are Larry G. Massanari, Acting Commissioner of Social Security[2] and Michael H. Holland, Marty D. Hudson, Thomas O.S. Rand, Elliot A. Segal, Carl E. Van Horn, Gail R. Wilensky, and William P. Hobgood, Trustees for the United Mine Workers of America. The Plaintiffs assert that Defendant Massanari, acting for the Social Security Administration ("SSA"), has unconstitutionally assigned to them responsibility for paying the health care premiums for certain retired coal miners, and their dependents, who previously had worked for either the Plaintiffs or their related companies. The specific assertion made by the Plaintiffs is that the decision of the Supreme Court of the United States in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) precludes the Commissioner from constitutionally assigning to the Plaintiffs the responsibility for paying these premiums.[3]

The Plaintiffs seek: (1) a declaratory judgment that the Coal Act is unconstitutional as applied to them (Count I (due process), Count II (takings)); (2) a judgment that SSA violated the Administrative Procedure Act 5 U.S.C. § 701, *et seq.*, when, pursuant to the Supreme Court's decision in *Eastern Enterprises*, it voided the assignment of Coal Act beneficiaries made to companies similarly situated to Plaintiffs, but refused to void assignments to Plaintiffs (Count III); and (3) an Order directing defendant Trustees of the United Mine Workers' Association Combined Benefit Fund ("the Trustees") to return all premiums previously paid by Plaintiffs on behalf of the wrongly assigned beneficia-

---

**1.** At one point, Belfry Coal Corporation ("Belfry") was also a plaintiff in this action, however, on April 28, 2000, the SSA voided the assignments made to Belfry, thereby rendering its action against the Defendants moot.

**2.** Pursuant to Rule 25(d)(1), Mr. Massanari has been substituted for Kenneth S. Apfel, former Commissioner of the Social Security Administration.

**3.** As of April 1, 1999, SSA, in compliance with the *Eastern Enterprises* decision, voided *ab initio* beneficiary assignments previously made to at least 122 coal companies that SSA deemed to be similarly situated to Eastern. Also, on April 1, 1999, SSA denied the Plaintiffs' request to void the assignments of beneficiaries to them, explaining that they are not similarly situated to the plaintiff in *Eastern Enterprises*.

ries (Count IV (unjust enrichment)[4] and VI (action for refund of payments under Employee Retirement Income Security Act)).[5]

In its counterclaims, the Combined Fund seeks: (1) a declaratory judgment that the Coal Act is constitutional as applied to companies like the Plaintiffs; (2) damages incurred as a result of the Plaintiffs' failure to pay the statutorily mandated premiums to the Combined Fund; and (3) injunctive relief requiring the Plaintiffs to pay the premiums and prevent the Plaintiffs from improperly disposing of corporate assets. The Combined Fund added the following related coal companies as counterclaim defendants: Rawl Sales and Processing Co., Omar Mining Co., PM Charles Coal Co., Rocky Hollow Coal Co., Sprouse Creek Processing Co., Big Bear Mining Co., Dehue Coal Co., Douglas Pocahantas Coal Corp., Hopkins Creek Coal Co., Joboner Coal Co., Majestic Mining, Inc., Performance Coal Co., Vantage Mining Co., Russell Fork Coal Co., and Vesta Mining Co.

The Plaintiffs have filed a motion for summary judgment requesting judgment as a matter of law in its their favor on their claims. The Commissioner has likewise filed a motion for summary judgment on the Plaintiffs' claims and the Trustees seek summary judgment on their counterclaims. The parties agree that the material facts are not in dispute and that the matter is appropriate for decision as a matter of law.[6] For the following reasons, summary judgment is granted in favor of the Defendant Commissioner on the Plaintiffs claims and summary judgment is denied on the Trustees' counterclaims.

## STATEMENT OF FACTS

### I. The Coal Act

#### A. Factual History Leading to the Enactment of the Coal Act

The history of the Coal Act is quite detailed and has been laid out comprehensively in numerous court decisions, including the *Eastern Enterprises* decision.[7] Hence, it will be recanted here but briefly. In 1946, a nationwide strike among coal miners erupted as a result of demands by the United Mine Worker's Association

---

4. Although the Plaintiffs caption Count IV in their Complaint as being directed against the Commissioner of the Social Security Administration, the substance of the count reveals that it is an allegation of unjust enrichment and a request for restitution against the Combined Fund.

5. Inexplicably, the Complaint does not contain a Count V.

6. During the course of this litigation, SSA questioned whether, considering the decision of the United States Court of Appeals for the Fourth Circuit in *Pittston Co. v. United States*, 199 F.3d 694 (4th Cir.1999), this Court had jurisdiction over this action. The parties were directed to file briefs on the matter and the Court held resolution of the current dispute in abeyance pending the Fourth Circuit's consideration of the jurisdictional issue in *Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291 (4th Cir.2000). The parties agree that, pursuant to the decision in *Sigmon*, this Court properly has jurisdiction to decide all matters herein raised. *Id.* at 303. The Court concurs in that assessment.

7. *See Eastern Enterprises*, 524 U.S. at 504–16, 118 S.Ct. 2131; *see also Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291 (4th Cir.2000); *Holland v. Big River Minerals Corp.*, 181 F.3d 597 (4th Cir.1999), *cert. denied*, 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000), *cert. denied* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000); *Anker Energy Corp. v. Consolidated Coal Co.*, 177 F.3d 161 (3rd Cir. 1999), *cert. denied sub nom.*, *Anker Energy Corp. v. United Mine Workers of America Combined Benefit Fund*, 528 U.S. 1003, 120 S.Ct. 496, 145 L.Ed.2d 383 (1999); *Unity Real Estate Co. v. Hudson*, 178 F.3d 649 (3rd Cir. 1998), *cert. denied*, 528 U.S. 963, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999).

("UMWA") that coal operators provide better health care benefits for their employees. *See Eastern Enterprises,* 524 U.S. at 504–05, 118 S.Ct. 2131.[8] After intervention by the federal government, the UMWA and several coal operators entered into the National Bituminous Coal Wage Agreement of 1947 ("1947 NBCWA"). *Id.* at 505, 118 S.Ct. 2131. The 1947 NBCWA established a trust fund, financed by royalties on coal produced, designed to provide pension and medical benefits to miners and their dependents. *Id.* at 505–06, 118 S.Ct. 2131.

In 1950, 1968, and 1971 new NBCWAs were adopted, each only slightly changing the terms and structure of the original agreement and providing for increases in the amount of royalties paid to the fund based on coal production. *Id.* at 506, 118 S.Ct. 2131. Essentially, under all four of those agreements, the miners and their families were never promised any specific benefits; instead the trustees of the fund had the discretion to establish and adjust the level of benefits provided. *Id.* at 506–07, 118 S.Ct. 2131. Significantly, the agreements did not guarantee lifetime health benefits for retirees or their dependents. *Id.* at 508, 118 S.Ct. 2131.

After Congress passed the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* which required specific funding and vesting of pension plans, the UMWA entered into a new NBCWA with the Bituminous Coal Operators' Association ("BCOA"), a multiemployer bargaining association created in 1951 to be the primary representative of coal operators in negotiations with the UMWA. *Id.* at 509, 118 S.Ct. 2131. The 1974 NBCWA, which was funded by royalties on coal production and premiums based on hours worked by miners, created four trusts funds. *Id.* Two of the trust funds covered retiree health benefits: the 1950 Benefit Plan provided health benefits to coal workers who retired before 1976 and the 1974 Benefit Plan covered those who retired on or after January 1, 1976. *Id.* The 1974 NBCWA, unlike any of its predecessors, expressly provided lifetime benefits to retirees and provided benefits to their widows until their death or remarriage. *Id.*

Soon after their creation, the 1950 and the 1974 Benefit Plans encountered financial difficulties attributable to: (i) the increased benefits provided by the 1974 NBCWA; (ii) a decline in the demand for coal; (iii) the retirement of an entire generation of miners; and (iv) the increasing costs of health care. *Id.* at 510, 118 S.Ct. 2131. In an attempt to alleviate the financial burden and in a move towards decentralization of the health-care benefit system organization, the next NBCWA, signed in 1978, ("the 1978 NBCWA") gave signatory employers the responsibility of providing health care to their own current and retired miners. *Id.* at 510, 118 S.Ct. 2131; *see also Sigmon Coal,* 226 F.3d at 295. The 1974 Benefit Plan, financed by the remaining participating coal operators, was restricted to cover only "orphaned" retirees whose former employers were no longer in business or otherwise ceased contributing to the funds. *Sigmon Coal,* 226 F.3d at 295. The 1978 NBCWA contained two provisions intended to ensure the plan's solvency: first, a "guarantee" clause requiring signatories to make sufficient contributions to maintain benefits during the agreement; and, second, an "evergreen" clause which required signatories to contribute to the fund as long as they

---

8. Unless otherwise noted, all citations to *Eastern Enterprises* hereinafter refer to the plurality opinion.

were in the coal industry, regardless of whether they signed any subsequent agreements. *Eastern Enterprises*, 524 U.S. at 510, 118 S.Ct. 2131.

Notwithstanding this attempt to shore up the financial problems of the funds, the financial decline rapidly progressed because of increasing costs and the withdrawal of employers from the 1978 NBCWA. *Id.* To address the problem, the federal government established an Advisory Commission on United Mine Workers of America Retiree Health Benefits ("Coal Commission"), which, after extensive studies, proposed a solution that was submitted to Congress. *Id.* at 511–12, 118 S.Ct. 2131. In the end, Congress passed the Coal Act, which was a modified version of the Coal Commission's recommendation. *Id.* at 514, 118 S.Ct. 2131.

### B. The Provisions of the Coal Act

The Coal Act, *inter alia,* combined the 1950 and 1974 Benefit Plans and created a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund ("Combined Fund"). *See* 26 U.S.C. § 9702(a)(2); *Eastern Enterprises,* 524 U.S. at 514, 118 S.Ct. 2131. The Combined Fund is designed to provide health and death benefits to coal industry retirees and their dependents who (1) were eligible to receive benefits from the 1950 or 1974 Benefit Plans and (2) were receiving benefits as of July 20, 1992. *See* 26 U.S.C. § 9703.[9] To finance the Combined Fund, the Act assesses annual premiums against "signatory operators," which the Act de-

fines as coal operators who have signed any coal wage agreement.[10] *See* 26 U.S.C. § 9701(c)(1). Any signatory coal operator who "conducts or derives revenue from any business activity, whether or not in the coal industry," may be required to contribute to the Combined Fund. 26 U.S.C. §§ 9701(c)(7), 9706(a). *See generally Eastern Enterprises,* 524 U.S. at 514, 118 S.Ct. 2131.

The premiums are calculated based on the number of retired coal miners and dependents (collectively "beneficiaries") assigned to the company. *See* 26 U.S.C. § 9704. The Coal Act directs the SSA Commissioner to assign beneficiaries to signatory operators based on the following three-tiered system:

> [the Commissioner shall assign the beneficiary to] a signatory operator which (or any related person with respect to which) remains in business in the following order:
>
> (1) First, to the signatory operator which—
>
> (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
>
> (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.
>
> (2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

---

**9.** The Coal Act also establishes the "1992 UMWA Benefit Plan," which provides health benefits coverage to eligible beneficiaries who are not covered by the Combined Fund. *See* 26 U.S.C. § 9712(b). Further, the Coal Act also mandates continuation of individual health plans maintained by signatories to the 1978 and later NBCWAs. 26 U.S.C. § 9711. These provisions are not at issue here.

**10.** The statute defines "coal wage agreement" as any NBCWA, or "any other agreement entered into between an employer in the coal industry and the United Mine Workers of America that required" the provision of health benefits to its retirees or contributions to the 1950, 1974 or any prior Benefit Plan. 26 U.S.C. § 9701(b)(1)(A), (B).

(A) was a signatory operator to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a).

A "related person," who may also be liable for contributing to the Combined Fund, is defined in the statute as follows:

a person shall be considered to be a related person to a signatory operator if that person is—

(i) a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;

(ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii).

26 U.S.C. § 9701(c)(2). Congress mandated that the relationship of related persons shall be determined as of July 20, 1992. *See* 26 U.S.C. § 9701(c)(2)(B).

Section 52(a) provides that "all employees of all corporations which are members of the same controlled group of corporations shall be treated as employed by a single employer." The statute then provides that "the term 'controlled group of corporations' has the meaning given to such term by section 1563(a) . . ." 26 U.S.C. § 52(a). Section § 1563(a), in turn, sets out three different types of controlled groups. The only category of controlled group relevant to this case is the "parent-subsidiary controlled group" which is defined as:

(1) Parent-subsidiary controlled group—One or more chains of corporations connected through stock ownership with a common parent corporation if— (A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned (within the meaning of subsection (d)(1)) by one or more of the other corporation; and (B) the common parent corporation owns (within the meaning of subsection (d)(1)) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

26 U.S.C. § 1563(a). The parties here have stipulated that the Plaintiffs fall within this definition of parent-subsidiary controlled group and are therefore "related persons" within the statutory definition.

The Coal Act also aggregates the employment of retirees by each "related person" in a controlled group of corporations:

"Any employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator." 26 U.S.C. § 9706(b)(1)(A). Furthermore, in assessing liability for premiums to be paid to the Combined Fund, § 9704(a) states that "any related person with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator." 26 U.S.C. § 9704(a).

## II. The Supreme Court's Decision in Eastern Enterprises

In *Eastern Enterprises*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451, the Supreme Court held that the Coal Act was unconstitutional as applied to certain former employers who had been assessed premiums by the Commissioner of the SSA. Eastern Enterprises ("Eastern") had conducted coal mining operations from 1929 until 1965, signing each NBCWA agreement executed between 1947 and 1964. *Id.* 524 U.S. at 516, 118 S.Ct. 2131. In 1965, Eastern transferred all of its coal-related operations to a subsidiary, Eastern Associated Coal Corporation ("EACC"), but retained a stock interest in EACC. *See id.* EACC signed every NBCWA executed after 1965. *See id.* at 566, 118 S.Ct. 2131. (Breyer, J., dissenting). *See also* Brief for the Federal Respondent, 1998 WL 25533, at *17. ("EACC was a signatory to the 1974, 1978, and 1988 agreements that expressly guaranteed lifetime benefits to all ligible miners and dependents."). In 1987, Eastern sold all of its interest in EEAC, and thereafter had no connections to the coal mining industry. *See Eastern Enterprises*, 524 U.S. at 516, 118 S.Ct. 2131.

Pursuant to § 9706(a) of the Coal Act and based on Eastern's status as a pre-1978 signatory operator for whom the min-ers had worked the longest period of time, the Commissioner of the SSA assigned to Eastern responsibility for paying the health care premiums for over 1,000 retired miners and their dependents. *Id.* at 517, 118 S.Ct. 2131. All of those miners had worked for Eastern before 1966. *Id.* The total liability for the premiums exceeded $50 million. *Id.* at 529, 118 S.Ct. 2131. Eastern sued the SSA Commissioner asserting that the assignment violated Eastern's substantive due process rights and constituted a taking of its property in violation of the Fifth Amendment of the United States' Constitution. *Id.* at 517, 118 S.Ct. 2131.

In an opinion in which no single rationale garnered a majority of votes, the Supreme Court held that the Coal Act, as applied to Eastern, was unconstitutional. Four justices found that the application of the Coal Act to Eastern violated the Fifth Amendment as an unconstitutional taking. *Id.* at 529–537, 118 S.Ct. 2131. Four justices found that the Act violated neither the Takings Clause nor Eastern's due process rights. *Id.* at 550–568, 118 S.Ct. 2131. Justice Kennedy, concurring in the judgment and dissenting in part, believed that the Coal Act did not work an unconstitutional taking, concluding instead that the retroactive nature of the Act violated Eastern's due process rights. *Id.* at 539–550, 118 S.Ct. 2131.

### A. The Plurality Opinion

The plurality agreed with Eastern that the assignment was an unconstitutional taking due to the extreme retroactive reach of the Act. "Eastern cannot be forced to bear the expense of lifetime health benefits for miners based on its activities decades before those benefits were promised." *Eastern Enterprises*, 524 U.S. at 537, 118 S.Ct. 2131. To arrive at this conclusion, the plurality employed a

three-factor test which considered: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectation; and (3) the character of the governmental action. *Id.* at 518, 118 S.Ct. 2131.

Applying this test, the plurality concluded that the economic impact was considerable—between $50 and $100 million. *Id.* at 529, 118 S.Ct. 2131. While acknowledging that this type of financial burden was not a *per se* taking because it was not a permanent physical occupation of Eastern's property, the plurality explained that the Court's decisions considering the constitutionality of similar legislative schemes, *id.* at 524, 118 S.Ct. 2131, "suggest[ed] that an employer's statutory liability for multiemployer plan benefits should reflect some 'proportion[ality] to its experience with the plan.'" *Id.* at 530, 118 S.Ct. 2131 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). *See also id.* at 528, 118 S.Ct. 2131 ("Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience").

As applied to Eastern, the requisite proportionality was lacking, the plurality reasoned, because:

[w]hile Eastern contributed to the 1947 and 1950 [benefit plans], it ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans under the 1974, 1978 or subsequent NBCWA's. *It is the latter agreements that first suggest an industry commitment to the funding of lifetime health benefits for both retirees and their family members.*

\*   \*   \*   \*   \*   \*

The company's obligations under the Act depend solely on its roster of employees some 30 to 50 years before the statute's enactment, without any regard to responsibilities that Eastern accepted under any benefit plan the company itself adopted.

*Id.* at 530–31, 118 S.Ct. 2131 (emphasis added).

As to Eastern's investment-backed expectations, the plurality noted that "[t]he Act's beneficiary allocation scheme reaches back 30–50 years to impose liability against Eastern based on the company's activities between 1946 and 1965 ... [The Act thereby] attaches new legal consequences to an employment relationship completed before its enactment." *Id.* at 532, 118 S.Ct. 2131 (citations omitted). The plurality found the fact that Eastern had not signed the 1974 NBCWA particularly significant because *"[n]ot until 1974 ... could lifetime medical benefits under the multiemployer agreement have been viewed as promised." Id.* at 535, 118 S.Ct. 2131 (emphasis added). However, in 1974, Eastern was no longer in the coal-mining industry, therefore, the plurality believed it unfair to allocate premiums to Eastern based on its past actions or any prior agreements, "implicit or otherwise," by the company. *Id.* at 535–36, 118 S.Ct. 2131.

In assessing the third factor, the nature of the government's actions, the plurality acknowledged the Congressional desire to solve a "grave problem in the funding of retired coal miners' health benefits," but "[w]hen ... that solution singles out certain employers to bear a burden that is substantial in amount, based on the employer's conduct far in the past, and unrelated to any commitment that the employ-

ers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause." *Id.* at 537, 118 S.Ct. 2131. Thus, the plurality concluded that the Act effected an unconstitutional taking as applied to Eastern. *Id.*

As to Eastern's Due Process claim, the plurality recognized that "this Court has expressed concerns about using the Due Process Clause to invalidate economic legislation." *Id.* (citing *Ferguson v. Skrupa,* 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963)). Because the plurality "determined that the third tier of the Coal Act's allocation scheme violates the Takings Clause as applied to Eastern, [it did] not address Eastern's due process claim." *Id.* at 538, 118 S.Ct. 2131.

### B. Justice Kennedy's Concurring Opinion

Justice Kennedy provided the fifth vote which held the Coal Act unconstitutional as applied to Eastern, but he disagreed with the plurality's analysis of the Takings Clause, explaining that: "the mechanism by which the Government injures Eastern is so unlike the act of taking specific property that it is incongruous to call the Coal Act a taking, even as that concept has been expanded by the regulatory takings principle." *Id.* at 542, 118 S.Ct. 2131 (Kennedy, J., concurring). Instead, Justice Kennedy concluded: "Given that the constitutionality of the Coal Act appears to turn on the legitimacy of Congress' judgment rather than on the availability of compensation, ... the more appropriate constitutional analysis arises under general due process principles rather than under the Takings Clause." *Id.* at 545, 118 S.Ct. 2131 (Kennedy, J., concurring).

Noting that the Court has long "harbored a distrust of retroactive statutes," *id.* at 537, 118 S.Ct. 2131, Justice Kennedy

acknowledged that that "[w]hile we have upheld the imposition of liability on former employers based on past employment relationships, the statutes at issue were remedial, designed to impose an 'actual, measurable cost of [the employer's] business' which the employer had been able to avoid in the past." *Id.* at 549, 118 S.Ct. 2131 (Kenney, J., concurring) (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). As applied to Eastern, the Coal Act did not serve any remedial purpose. *Id.* at 549–550, 118 S.Ct. 2131 (Kennedy, J., concurring). Eastern had not created any expectation of lifetime health benefits, (because it had not signed the 1974 or subsequent NWBCA) and it had not been responsible for the financial turmoil in the benefit funds. *Id.* at 550, 118 S.Ct. 2131 (Kennedy, J., concurring). Rather, Justice Kennedy agreed with the plurality's conclusion that "the expectation was created by promises and agreements made long after Eastern left the coal business." *Id.* (Kennedy, J., concurring).

Therefore, despite the deferential view applied to substantive due process challenges to economic legislation, Justice Kennedy believed that the extreme retroactive nature of the liability constituted "one of those rare instances in which even such a permissive standard has been violated." *Id.* at 550, 118 S.Ct. 2131 (Kennedy, J., concurring).

### C. The Dissent's Opinion

The four dissenting Justices argued that the Coal Act effected neither an unconstitutional taking, nor did it interfere with Eastern's due process rights. *Id.* at 550–68, 118 S.Ct. 2131 (Stevens, J. dissenting and Breyer, J. dissenting). Agreeing with Justice Kennedy, the dissent found that the Takings Clause was not applicable to this case because it did not concern a

governmental taking of private property to serve the public good. *Id.* at 554, 118 S.Ct. 2131 (Breyer, J. dissenting). "This case involves, not an interest in physical or intellectual property," which has been the traditional focus of the Takings Clause, "but an ordinary liability to pay money, and not to the Government, but to third parties." *Id.* at 554, 118 S.Ct. 2131 (Breyer, J., dissenting).

Like Justice Kennedy, the dissenting justice concluded that "[t]he question involved—the potential unfairness of retroactive liability—finds a natural home in the Due Process Clause, a Fifth Amendment neighbor." *Id.* at 556, 118 S.Ct. 2131 (Breyer, J., dissenting). Writing for the dissenters, Justice Breyer believed that "even though Eastern left the coal industry in 1965, the historical circumstances, taken together, prevent Eastern from showing that the Coal Act's 'reachback' liability provision so frustrates Eastern's reasonable settled expectations as to impose an unconstitutional liability." *Id.* at 559, 118 S.Ct. 2131 (Breyer, J., dissenting). The dissent based this conclusion on the fact that the statute imposed liability on Eastern only for the miners that it employed, *id.;* Eastern benefitted from the employment of the miners, *id.* at 560, 118 S.Ct. 2131; Eastern contributed to making the implicit promise to miners of post-retirement benefits, even though Eastern did not sign the 1974 or subsequent NBCWAs, *id.* at 560–565, 118 S.Ct. 2131; and Eastern continued to obtain profits from the coal mining industry long after it left the industry in 1965, through its wholly owned subsidiary EACC. *Id.* at 565–66, 118 S.Ct. 2131. Therefore, the Act did not violate either the Takings clause or the Due Process clause.

In sum, five justices rejected the takings theory, and only one decided the issue on due process grounds.

## III. MASSEY COAL COMPANIES

A.T. Massey Coal Company ("A.T.Massey") is the parent company to numerous wholly-owned subsidiaries who are engaged in coalmining operations. Three of these subsidiaries join A.T. Massey as Plaintiffs in this action. The Plaintiffs have been assigned liability for paying premiums for retired coal miners and their dependants based on 26 U.S.C. § 9706(a)(3). It is undisputed that A.T. Massey and its subsidiaries comprise a "controlled group of corporations," as defined by the Coal Act. *See* 26 U.S.C. § 9701(c).

### A. A.T. Massey

A.T. Massey has been assigned responsibility for paying, at varying points since February 1993, the premiums on a total of 82 retired coal miners and dependants, resulting in a total liability of $758,229.21. Despite its involvement with numerous subsidiaries who signed coal wage agreements, A.T. Massey has never signed a UMWA wage agreement. All 82 of the miners were employed by an A.T. Massey subsidiary named Ben Creek Coal ("Ben Creek") or a corporate predecessor of Ben Creek. The corporate history of Ben Creek is quite complex, though it need be discussed only briefly here.

In 1958, shortly after signing the 1958 UMWA, Merrill Coal, a subsidiary of A.T. Massey, merged with Gay Mining Company, also an A .T. Massey subsidiary. Gay Mining signed the 1958 UMWA before changing its name in 1958 to Massey Coal Mining Company ("Masey Coal Mining"). The mining company operated under this name from 1958 to 1977 and signed the 1964 UMWA during this time period. In 1977, the company again changed its name, this time to Ben Creek Coal.

## B. Massey Coal Services, Inc.

Massey Coal Services, Inc. ("Massey Coal Services"), a wholly-owned subsidiary of A.T. Massey, has been assigned, at varying points since February 1993, a total of two beneficiaries under the Coal Act, resulting in a total liability of $34,473.25. The assigned beneficiaries formerly worked for Ben Creek or its corporate predecessors. Like the parent company A.T. Massey, Massey Coal Services has never signed a UMWA wage agreement.

## C. Peerless Eagle Coal Company

Peerless Eagle Coal Co. ("Peerless Eagle") has been assigned, at varying points since February 1993, a total of 45 beneficiaries resulting in a total liability of $447,877.75 in premiums. The retired miners at issue here were employed by Peters Creek Coal Company ("Peters Creek"), a coal mining company that merged into Peerless Eagle in 1962. Though Peters Creek last signed a NBCWA in 1958, Peerless Eagle has never signed a NBCWA.

## D. Tennessee Consolidated Coal Company

Tennessee Consolidated Coal Company ("TCC") has been assigned, at varying points since 1993, a total of 204 beneficiaries, resulting in a total liability of $1,807,220.92 in premiums for the former miners of TCC. TCC last signed a coal wage agreement in 1960.

## E. Other A.T. Massey Subsidiaries

Numerous wholly-owned subsidiaries of A.T. Massey, who are not plaintiffs to this action, signed the 1974 or subsequent NBCWAs, including: (1) Omar Mining (1974, 1978, 1981, and 1984 NBCWAs); (2) Douglas Pocahontas (1974, 1978, and 1981 NBCWAs); (3) Hopkins Creek (1978, 1981, and 1984 NBCWAs); (4) Russell Fork (1974, 1978, and 1981 NBCWAs); (5) Big Bear (1978 and 1981 NBCWAs); (6) Rocky Hollow (1974, 1978, and 1981 NBCWAs); (7) Majestic Mining (1974, 1978, 1981, and 1984 NBCWAs); (8) Dehue (1981 NBCWA); (9) PM Charles (1974 and 1978 NBCWAs); (10) Sprouse Creek (1974, 1978, and 1981 NBCWAs); (11) Vesta (1981 NBCWA); (12) Vantage Mining (1984 NBCWA); and (13) Joboner (1978 and 1981 NBCWAs).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment assumes the initial responsibility of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Catawba Indian Tribe of South Carolina v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993); Fed.R.Civ.P. 56(c). Once this initial showing under Rule 56(c) is made, the burden of production shifts to the non-moving party, who must then "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (empha-

sis added). "The evidence of the non-movant is to be believed" and "all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

The parties here agree that there are no genuine issues of material fact in dispute.[11] Therefore, the issues being only those of law, the case is ripe for summary judgment.

## II. The Constitutional Challenge

■ Resolution of the Plaintiffs' request for a declaration that the Coal Act is unconstitutional, as applied to them, essentially resolves the remaining claims and counterclaims. Therefore, the analysis will be made in that context. The dispositive question is whether the Plaintiffs are in a substantially identical position to the plaintiff in *Eastern Enterprises* such that the decision in *Eastern Enterprises* necessitates the conclusion that the Coal Act is unconstitutional as applied to the Plaintiffs. The Plaintiffs (who did not sign the 1974 or subsequent NBCWA) contend that the assignment to them of beneficiaries (who worked for the Plaintiff companies or other non-signatory companies) on the basis of the Plaintiffs' "related person" status to companies that signed the post–1974 NBCWAs, effects an unconstitutional taking and a violation of due process under the Fifth Amendment.

### A. The Takings Claim

Though the holding in *Eastern Enterprises* was splintered, it is clear that majority of the Court believed that the Coal Act, and its assessment of premiums, did not constitute a taking within the ambit of the Fifth Amendment. *See Holland v. Big River Minerals Corp.,* 181 F.3d 597, 606 (4th Cir.1999), *cert. denied* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000). "[F]ive Justices rejected the conclusion that an unconstitutional taking was effected, reasoning that the constitutionality of the financial burden on the company imposed by the Coal Act must be considered as a question of substantive due process rather than as a takings question because no identifiable property interest was infringed by the legislation." *Id.See also Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 659 (3d Cir.1999) ("we are bound to follow the five-four vote against the takings claim in *Eastern* ..."), *cert. denied* 528 U.S. 963, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999); *Holland v. Pardee Coal Co., Inc.,* 93 F.Supp.2d 706 (W.D.Va.2000) ("In *Eastern Enterprises,* ... five justices unequivocally stated that constitutional challenges to the funding provisions of the Coal Act must be analyzed under the Due Process Clause and its principles of fundamental fairness ... Thus, the court will not consider the Defendants' takings claim."); *United States v. Dico, Inc.,* 189 F.R.D. 536, 543 (S.D.Iowa 1999) ("In short, the only rationale embraced by at least five judges in *Eastern Enterprises* is that retroactive application of the Coal Act to Eastern did not violate the Takings Clause.").

Because the decision in *Eastern Enterprises* clearly rejects the same takings argument which the Plaintiffs present here, the Plaintiffs' motion for summary judgment on Count II of the Complaint (the takings claim) is denied and summary

---

**11.** The briefs raised one possible dispute of fact concerning the correct employer for a deceased miner named Percy Richmond. Because the Joint Submission of Assignments filed on June 16, 2000 purportedly resolved all issues of disputed fact, this Memorandum Opinion does not address the liability for premiums for Mr. Richmond. If the parties believe that this issue persists, they are to file appropriate pleadings within ten days of the entry of this Memorandum Opinion and accompanying Order.

judgment is granted in favor of the Commissioner on Count II.

## B. The Due Process Claim

■ The only other argument offered to support the Plaintiffs' constitutional attack is that they are identically situated to the petitioner in *Eastern Enterprises* and that, therefore, the assessment of premiums against them here is unconstitutional for the same reason it was unconstitutional in *Eastern Enterprises.* At the outset, it is necessary to analyze and understand the effect of the fractured *Eastern Enterprises* decision before determining that decision's impact on the Plaintiffs' constitutional claims.

[3] The assessment begins with an understanding of the principle that: "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (internal citations omitted). However, there may "not always be such a common denominator in the Court's reasoning. In some splintered decisions, there will be three or more distinct approaches, none of which is a subset of another; instead, each approach is simply different." *Rappa v. New Castle County,* 18 F.3d 1043, 1058 (3d Cir.1994) (citing *King v. Palmer,* 950 F.2d 771, 782–83 (D.C.Cir.1991)). Such is the case with *Eastern Enterprises* because no single approach received a majority of the votes from the Court. *See Association of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1254 (D.C.Cir.1998) ("We have previously held that the rule of *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), under which the

opinion of the Justices concurring in the judgment on the 'narrowest grounds' is to be regarded as the Court's holding, does not apply unless the narrowest opinion represents a 'common denominator of the Court's reasoning' and 'embod[ies] a position implicitly approved by at least five Justices who support the judgment.'"). *See also Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 170 (3rd Cir. 1999), ("in cases where the approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court"), *cert. denied sub nom., Anker Energy Corp. v. United Mine Workers of America Combined Benefit Fund,* 528 U.S. 1003, 120 S.Ct. 496, 145 L.Ed.2d 383 (1999).

Those courts considering the scope of the splintered decision in *Eastern Enterprises* unanimously have concluded that "*Eastern* ... mandates judgment for the plaintiffs only if they stand in a *substantially identical* position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence." *Unity,* 178 F.3d at 659 (emphasis added). *See Anker,* 177 F.3d at 170 ("*Eastern Enterprises* requires a finding that the Coal Act is unconstitutional as applied to Anker, then, only if Anker 'stand[s] in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence.'") (citing *Unity,* 178 F.3d at 659); *Association of Bituminous Contractors,* 156 F.3d at 1255 ("In short, the government is correct in stating that the only binding aspect of *Eastern Enterprises* is its specific result—holding the Coal Act unconstitutional as applied to Eastern Enterprises."); *Berwind Corp. v. Apfel,* 94 F.Supp.2d 597, 606 (E.D.Pa.2000) (same). Moreover, the parties, here, agree that the reach of *Eastern Enterprises* is limited to cases that present

facts which are substantially identical to those present in *Eastern Enterprises.*

### 1. The Plaintiffs Are Not Substantially Identical to the Petitioner in *Eastern Enterprises*

Although there are some similarities between the Plaintiffs and Eastern, the bases for imposing liability on the respective companies under the Coal Act are sufficiently different so as to preclude a finding that the Plaintiffs and Eastern are substantially identical. In *Eastern Enterprises,* the Commissioner of the SSA assigned to Eastern the responsibility for paying health benefit for miners it had employed before 1966. *Eastern Enterprises,* 524 U.S. at 517, 118 S.Ct. 2131. The Commissioner made this assignment, under 26 U.S.C. § 9706(a), based on Eastern's status as the pre–1978 signatory for whom the miner had worked for the longest period of time. *Id.* Eastern had not signed the "watershed" 1974 and 1978 NBCWAs, though its one-time subsidiary EACC did sign every NBCWA executed after 1965. *Id.* at 566, 118 S.Ct. 2131 (Breyer, J. dissenting). Eastern "ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans under the 1974, 1978, or subsequent NBCWA's." *Id.* at 530, 118 S.Ct. 2131. Therefore, on the date specified for determining "related person" status (July 20, 1992), Eastern was not a "related person" to a signatory of the 1974 or subsequent NBCWA.

Here, as in *Eastern Enterprises,* the Commissioner assigned to the Plaintiffs the obligation to contribute to the Combined Fund, even though none of the Plaintiffs were signatories to the "watershed" 1974 or subsequent NBCWA's. However, unlike the situation presented in *Eastern Enterprises,* the Commissioner here based the assignments on the status of the Plaintiff companies as "related persons" to a 1974 or subsequent wage agreement signatory. It is undisputed that the Plaintiffs are related to numerous A.T. Massey subsidiaries who signed the 1974 or later NCBWA's.[12] Nevertheless, despite the differing theories of liability for the beneficiaries, the Plaintiffs insist that they are substantially identically situated to Eastern and that Eastern's sale of its subsidiary EACC in 1987 should have no impact upon the analysis. This argument is unpersuasive.

*Eastern Enterprises* did not, in any fashion, address the constitutionality of the liability of "related persons" under the Coal Act. Indeed, the plurality specifically noted that "[a]lthough EACC continued mining coal until 1987 as a subsidiary of Eastern, *Eastern's liability under the Act bears no relationship to its ownership of EACC;* the Act assigns Eastern responsibility for benefits relating to miners that Eastern itself, not EACC, employed, while EACC would be assigned the responsibility for any miners that it had employed." *Eastern Enterprises,* 524 U.S. at 530, 118 S.Ct. 2131.

In addition to this express disclaimer in the plurality opinion, the Plaintiffs' argument also runs afoul of the Fourth Circuit's conclusion in *Big River,* 181 F.3d 597, where the Court of Appeals made clear that *Eastern Enterprises* has no bearing on "related person" (*i.e.* control

---

12. As a point of clarification, the Plaintiffs here do not contest the portion of the Coal Act that imposes joint and several liability upon the companies for the assignment of beneficiaries that worked for a "related person" *who was a signatory* to the 1974 or later NBCWA. Instead, the Plaintiffs contend that the Commissioner cannot, through the "related person" clause, assess liability for premiums for beneficiaries that worked for a pre–1974 signatory (or non-signatory).

group) liability: "*Eastern Enterprises did not address* whether the Coal Act violated the due process rights of members of a control group of signatories to NBCWAs promising lifetime health benefits for retired miners." *Id.*, at 606 (emphasis added). Instead, the opinion could "*only* be viewed as rendering a decision that Congress acted arbitrarily in imposing retroactive liability on a signatory to NBCWAs in existence prior to those that promised lifetime health benefits to retired miners when that signatory made *no promise* of lifetime benefits, did not contribute to the problem that caused the funding shortfall for the promised lifetime benefits or to the need for such benefits, and was not put on notice by any governmental action during the relevant time period that it might be subjected to later liability." *Id.* (emphasis added and internal citations omitted). Thus, the Fourth Circuit, addressing a situation similar to the control group of related Plaintiff companies here, concluded:

> *The position of members of a control group upon whom liability is imposed only by virtue of that association is*

different from that of the NBCWA signatory in Eastern Enterprises. And, the considerations bearing upon whether Congress acted rationally in imposing retroactive liability on the NBCWA signatory in Eastern Enterprises are different than those relating to the rationality of imposing liability on members of a control group of a 1978 or subsequent benefit plan signatory, although admittedly some of the same arguments can be made with respect to both issues. *Id.* (emphasis added).[13]

In response, the Plaintiffs argue this case is factually distinct from the situation considered in *Big River* and the other cases upon which the Defendants rely, such as *Unity*, 178 F.3d 649, and *Anker*, 177 F.3d 161. To the extent that these cases may have factual distinctions, these distinctions are irrelevant to the issue presented here, namely whether the Plaintiffs are substantially identical to Eastern.

## 2. *Big River*

In *Big River*, the district court entered a judgment requiring the defendant com-

**13.** The Plaintiffs try to shoehorn a "related person" liability analysis into the plurality's holding *Eastern Enterprises* by relying upon various arguments made by the dissent in *Eastern Enterprises* indicating that Eastern's connection to EACC should be sufficient to support liability under the Act. *See* , *118 S.Ct. 2131Eastern Enterprises*, 524 U.S. at 565, 118 S.Ct. 2131 (Breyer, J., dissenting) ("Eastern effectively ran EACC, sharing officers, supervising management, and receiving 100% of EACC's approximately $100 million in dividends."); *id.* at 566, 118 S.Ct. 2131 ("Eastern officials, in their role as EACC directors, ratified the post–1965 bargaining agreements ... and must have been aware of the [benefit fund's] deepening financial crisis.") Thus, the Plaintiffs contend that "[t]he Court had a related person situation squarely in its sights, and the plurality necessarily considered the relevance of that relationship before it voided Eastern's assignments." Plaintiffs' Reply Brief at 7.

This attempt to cobble together a fact-specific constitutional holding from the splintered decision in *Eastern Enterprises* is unsuccessful. As an initial matter, the Plaintiffs' contention that the plurality *Eastern Enterprises* necessarily decided the constitutionality of "related person" liability flatly contradicts the Fourth Circuit's holding to the contrary in *Big River*, a decision which is controlling here.

Secondly, it would be jurisprudential error to infer conclusions and assumptions (which were unstated) by the plurality by dissecting the views of the dissent. As explained above, when a Supreme Court decision is as fractured as *Eastern Enterprises*, the decision leaves almost no precedential guidance to lower courts. Whatever the holding of *Eastern Enterprises* may be, a district court must reject invitations to expand that holding by inferring unspecified "necessarily considered" conclusions.

panies to pay premiums for 11 retired miners. *See* 181 F.3d at 600. Because the district court's decision was made before the Supreme Court decided *Eastern Enterprises,* two of the defendant companies filed a motion for reconsideration in light of that decision because those companies "never employed the covered miners and were not within the control group when the miners were employed." 181 F.3d at 600, 604. The district court held that the defendants had waived their constitutional challenge to the Coal Act. *Id.* at 600. In affirming the district court, the Fourth Circuit noted the defendants were not signatories to a wage agreement providing lifetime benefits to miners, however they were members of a control group of a signatory company. *Id.* at 604.

As argued by the Plaintiffs here, the facts of *Big River* are somewhat distinct from the Plaintiffs' situation because the Commissioner in *Big River* did not attempt to hold the defendant companies liable for providing health benefits to their *own* former employees. Nevertheless, the ultimate holding of *Big River* did not hinge upon this factor. Instead, as explained above, *Big River* stands for the proposition that, whatever the basis for the unconstitutionality of the Coal Act as applied in *Eastern Enterprises,* the decision did not address control group or related person liability. *See Big River,* 181 F.3d at 606. Thus, the decision in *Big River* is not amenable to the distinction which the Plaintiffs attempt to ascribe to it.

### 3. *Anker*

In *Anker,* the plaintiff Anker Energy Corp. ("Anker") contested the assignment of liability to pay premiums for miners employed King Knob Coal Co., Inc. ("King Knob"), a related company to Anker. *Anker,* 177 F.3d at 166. It was undisputed that King Knob signed wage agreements promising lifetime benefits to miners and that Anker was a related company to King Knob. *Id.* at 166–67.

The Third Circuit rejected the plaintiffs' argument that they were substantially identical to Eastern. *Id.* at 172. The *Anker* court read *Eastern Enterprises* to mean "that a majority of the Court would find the Act unconstitutional when applied to an employer that did not agree to the 1974 or subsequent NBCWAs, while application of the Act to a signatory to the 1974 or a subsequent wage agreement would be an entirely different matter." *Id.*

Though both Anker and King Knob were the petitioners in *Anker,* the Third Circuit explained that "[a]s a matter of convenience we usually refer to Anker alone as the plaintiff and appellant." *Id.* at 167. The court then went on to explain that "[w]e believe the fact that Anker was a signatory to [wage agreements] from the 1970s until 1984 factually distinguishes Anker's situation from that of Eastern Enterprises and compels a finding that the Act is constitutional in this instance." *Id.* at 172. Therefore, Anker's and King Knob's claims "[fell] outside the specific holding of *Eastern Enterprises,*" and the application of the Coal was constitutional. *Id.*

It appears that the assignment of beneficiaries in *Anker* focused only upon the liability of Anker as a "related person" to King Knob, the employer of the retired miners and a signatory to wage agreements in the 1970's and 1980's. In the present action, the Plaintiffs are at great pains to point out that they were assessed liability not for miners that worked for "related" post–1974 signatories, but instead were held liable for their *own* employees and employees of other related companies that did not sign the 1974 or subsequent NBCWAs. This effort to distinguish *Anker* is unpersuasive because

the *Anker* court focused not on the source the liability, but rather the rationale for imposing that liability. Unlike the situation in *Eastern Enterprises,* Anker was a "related person" to a company that had signed the pivotal 1970s wage agreements. Agreeing with the reasoning of the United States Court of Appeals for the District of Columbia, the *Anker* court stated, "The clear implication of each opinion in *Eastern Enterprises* is that employer participation in the 1974 and 1978 agreements represents a sufficient amount of past conduct to justify the retroactive imposition of Coal Act liability (for the dissenting justices, of course, such participation is not even necessary)." *Id.* at 172 (quoting *Association of Bituminous Contractors,* 156 F.3d at 1257). Thus, the fact that the assigned beneficiaries may not have been employed by the "related person" companies who signed the relevant wage agreements is insufficient to escape the reach of *Anker* (or place the Plaintiffs within the ambit of *Eastern Enterprises*) because *Anker* emphasizes that it is the *association* with a signatory related company that supports the imposition of liability for health benefits. *See id.* at 172 (" 'the crucial fact upon which the *Eastern Enterprises* plurality and Justice Kennedy relied in concluding that Eastern's Coal Act liability was disproportionate to its past conduct and thus unfairly retroactive-namely Eastern's departure from the coal industry in 1965-is absent in this case' ") (quoting *Association of Bituminous Contractors,* 156 F.3d at 1256).

### 4. *Unity*

Perhaps the most factually analogous case, and the most detrimental to the Plaintiffs' argument, is the Third Circuit's decision in *Unity.* Because the intricate factual details of *Unity* are not set forth with detail in the Court of Appeals' opinion, it is helpful to turn to the underlying district court proceedings to fully understand the background of the case. *See generally Real Estate Co. v. Hudson,* 977 F.Supp. 717, 718 (W.D.Penn.1997) (district court summary judgment opinion); *Unity Real Estate v. Hudson,* 889 F.Supp. 818, 821 (W.D.Penn.1995) (district court preliminary injunction opinion).

The Plaintiff Unity Real Estate Co. ("Unity") was a corporation held by the members of the Jamison family, owned only a commercial building and a parking lot. *Unity* 178 F.3d at 654–55. Unity, however, had been assigned premiums under the Coal Act as a "related person" to several coal mining companies, which were also formed by members of the Jamison family: South Union–PA, South Union–WVA and Stewart Coal and Coke Co. *Id.* at 655. South Union–PA mined Coal from 1923 to 1961 and signed the 1947 NCBWA. *Id. See also Unity Real Estate Co. v. Hudson,* 977 F.Supp. 717, 718 (W.D.Penn.1997) (district court summary judgment opinion) ("In 1961, South Union [PA] closed down and remained idle until its merger with Unity in 1969."). South Union–WVA was incorporated in 1974 as a wholly-owned subsidiary of Unity and operated the coal mine formerly run by South Union–PA from 1975 to 1981. *Unity,* 977 F.Supp. at 719 (district court summary judgment opinion). South Union–WVA signed the 1974, 1978 and 1981 NBCWAs.[14] *Unity,* 178 F.3d at 655. Lastly, Stewart Coal & Coke Co. ("Stewart") was incorporated by the Jamison family in 1949 and operated a coal mine and coke manufacturing plaint until the late 1950s. *Unity,* 977 F.Supp. at

---

14. A bankruptcy court ultimately allowed it to renounce its obligations under the 1981 agreement. *Id.*

719 (district court summary judgment opinion). Stewart made payments into the UMWA benefit funds from 1949 to 1958. *Id.* Other related companies in the Jamison corporate family signed NBCWAs at various times from the 1960s through the 1970s. *Unity*, 178 F.3d at 655.

The Commissioner assigned beneficiaries to Unity "on the basis that the beneficiaries, or their deceased parents or spouses in the case of survivor beneficiaries had last worked for South Union (Pennsylvania) or South Union (West Virginia) pursuant to a NBCWA." *Unity Real Estate v. Hudson*, 889 F.Supp. 818, 821 (W.D.Penn. 1995) (district court preliminary injunction opinion). Thus, the Commissioner assigned liability based on the miners' employment with South Union–WVA, a related company who signed a post–1974 wage agreement, *and* employment with South Union–PA, a related company who *had not* signed the pivotal 1974 and subsequent NBCWAs. On appeal, it appears that Unity did not differentiate its challenge to the assignment of beneficiaries on the basis that some of the miners had been employed by post–1974 signatories while others were employed by companies who had not signed the "watershed" agreements.[15] *See Unity*, 178 F.3d at 655 ("The assignment was based upon Unity's prior employment of 63 miners, who had worked for Unity and its related companies, on average, for ten years").

Even though the Third Circuit was not faced with the precise arguments made here, the finding in *Unity* that the parent company could be held liable to pay premiums for miners that worked both for pre- and post–1974 related companies makes

---

**15.** The Plaintiffs here have submitted the affidavit of David L. Laurent in an attempt to escape the direct applicability of *Unity*. Mr. Laurent, counsel for Unity in that action, explains that Unity did not challenge the constitutionality of the assignments for beneficiaries who had worked only for South Union–PA (the pre–1974 signatory) because Unity had limited financial resources. From this, the Plaintiffs extrapolate that, "because of the particular procedural posture of [*Unity*], the Third Circuit was not presented and never decided the issue of whether the assignment to Unity of beneficiaries that worked only for a pre–1974 signatory could be deemed constitutional based solely on the fact that one of Unity's other related persons (South Union WVA) had signed a 1974 NBCWA." Plaintiffs' Reply Brief for Summary Judgment and Brief in Opposition to Defendants' Motion for Summary Judgment at 21.

This affidavit does not change the procedural posture of *Unity*. While the petitioners in that case may not have made the arguments presently pressed by the Plaintiffs, the Third Circuit nevertheless found that the assignment of beneficiaries—*all* beneficiaries was a constitutional application of the Coal Act and that Unity was not in a substantially identical situation to Eastern. Though the recitation of facts in the appellate *Unity* decision may not make the distinction crystal clear, this Court is quite reticent to assume that the Third Circuit did not understand the factual background of the controversy before it. Indeed, the lack of distinction between the pre- and post–1974 signatory related companies could arguably support the idea that the Third Circuit simply perceived no difference between the two.

Additionally, the Trustees highlight another difficulty with attributing any significance to Mr. Laurent's affidavitit is simply incorrect. Out of the 63 retired coal miners who were assigned to Unity, only 10 ever worked for South Union–WVA, the only post–1974 signatory employer at issue. *See* Trustee's Reply Memorandum in Support of Summary Judgment (citing to and attaching Unity Real Estate Company's Responses to Defendants' First Request for Admissions at Nos. 28, 34–96). Thus, if Unity truly sought to efficiently limit its liability, it would have made this argument as well because that would have significantly limited its exposure. The simple truth, however, is that the Third Circuit considered the challenge as presented that is, whether or not Unity could be assessed liability for health benefits for miners who worked for related companies who were both pre- and post–1974 signatories to NCBWAs.

*Unity* especially helpful here, both factually and analytically. Thus, *Unity*'s conclusion is persuasive authority.

In *Unity,* the Third Circuit found that "[b]ecause the plaintiffs signed NBCWAs in 1974 and thereafter, *they are factually distinguishable* from Eastern Enterprises." *Unity* 178 F.3d at 659. The parent company Unity never signed a coal wage agreement, therefore the Court's reference to the participation in the 1974 and later NBCWAs must necessarily refer to the fact that South Union–WVA, a related company to Unity, signed the agreement. This single company's participation in the "watershed" wage agreements was sufficient to impose liability for health benefits for miners who had worked for all the companies, not just those employed by the signatory company.

Like other courts considering the matter, the *Unity* court explained that "[l]anguage in the plurality and the concurrence suggesting that expectations fundamentally changed after 1974 supports our conclusion." *Id.* Moreover, the fact that *Eastern Enterprises* did not address related company liability buttressed the court's conclusion: "Although we recognize that the [*Eastern Enterprises* ] Court was not presented with argument focused on post–1978 signatories and thus may not have had before it all the available evidence about later contracts, *that very distinction compels the conclusion that Eastern is not on all fours with the case before us.*" *Id.* (emphasis added).

## 5. Conclusion

As *Big River, Anker* and *Unity* demonstrate, a company that is assigned liability for premiums under the Coal Act based on its status as a "related person" to a 1974 or subsequent NBCWA signatory is not substantially identical to Eastern because *Eastern Enterprises* did not addresses related person liability. Instead, it merely held that the assignment of the obligation to pay premiums to a company that did not promise lifetime health benefits, and who was not a "related person" to a company that made such a promise, was unfairly retroactive and, therefore, unconstitutional.

■ While the thorny issue of beneficiary assignments under the Coal Act may have other statutory fallacies,[16] those arguments are not raised here by the Plaintiffs. Significantly, the Plaintiffs failed to articulate any due process violation other than its substantial identity to the facts of *Eastern Enterprises.*[17] The Plaintiffs

---

**16.** Of particular note is *Berwind Corp. v. Apfel,* 94 F.Supp.2d 597 (E.D.Pa.2000), where the plaintiff company made the same arguments pressed here (*i.e.,* that the Commissioner could not constitutionally assign to a company liability to pay premiums for its *own* retired miners when that company did not sign the relevant NBCWAs) and the district court held that the application was unconstitutional under *Eastern Enterprises.* That decision, however, was directed more to what the district court believed was an erroneous application of the Coal Act than the similarity of the Plaintiffs to Eastern.

To the extent that *Berwind* may have relevance here, the Court finds more persuasive the decision in *Shenango, Inc. v. Apfel,* Civil

Action No. 99–1035 (W.D.Pa. July 25, 2000), in which the district court concluded that the plaintiffs were not substantially identically situated to Eastern, despite the fact that the companies for whom the beneficiaries had worked had never signed the 1974 or subsequent NBCWAs. Both *Shenango* and *Berwind* are currently on appeal to the Third Circuit.

**17.** Indeed, during argument on this motion, the Plaintiffs were quite pointedly asked to identify and articulate any other due process argument. They could not. Even though the Defendants' pleadings should have put the Plaintiffs on notice that their due process argument was quite narrow, *see* Trustees' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 14

have failed to explain why, if the Court were to find them not substantially identical to Eastern, the application of the Coal Act could nevertheless work a violation of due process. It would be inappropriate to entertain other possible, but ill-defined, due process argument because "[c]ourts do not adjudicate generalized claims of unconstitutionality, but rather resolve constitutional questions by applying these settled doctrines to specific constitutional claims asserted under specific constitutional clauses." *Association of Bituminous Contractors*, 156 F.3d at 1253. Therefore, unlike the arguments made, and decisions reached, in *Unity* and *Anker*, it is unnecessary to address the any remaining due process considerations. *See Unity*, 178 F.3d at 659 ("To the extent that *Eastern* embodies principles capable of broader application, we believe that due process analysis encompasses the relevant concerns... and we believe that the relevant measurement is the extent of the gap between the coal companies' contractual promises to the Funds and the requirements of the Coal Act."); *Anker*, 177 F.3d at 172–73 ("our opinion in *Unity Real Estate* directs us to apply an additional level of due process analysis designed to measure 'the extent of the gap between the coal companies' contractual promises to the Funds and the requirements of the Coal Act.'"). *See also Association of Bituminous Contractors*, 156 F.3d at 1255 (because the plaintiffs were not substantially identical to Eastern "our basic inquiry in resolving appellant's due process challenge remains the same ...").

Because the Plaintiffs fail on their sole due process argument, the Plaintiffs' mo-

tion for summary judgment is denied and summary judgment is granted in favor of the Defendant Commissioner on Count I.

### III. The Commissioner's Assignment of Beneficiaries to the Plaintiffs

The Commissioner's decision to assign beneficiaries to the Plaintiffs must be set aside if the Court finds that his action was either "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Plaintiffs assert that the SSA Commissioner's action was not in accordance with law because it is contrary to both the Supreme Court's decision in *Eastern Enterprises* and the Plaintiffs' constitutional rights. Having found above that the assessment of premiums to the Plaintiffs under the Coal Act is not in contravention of the Supreme Court's holding in *Eastern Enterprises*, the SSA Commissioner's decision must stand as it is neither arbitrary nor capricious, and otherwise is in accordance with law. Therefore, the Plaintiffs' motion for summary judgment on Count III is denied and summary judgment is granted in favor of the Defendant Commissioner on that count.

### IV. Return of Plaintiffs' Premiums Already Paid

Having found that the premiums were constitutionally assessed against the Plaintiffs under the provisions of the Coal Act, the Court also finds that the Plaintiffs are not entitled to have the Combined Fund return those premiums paid to the Fund.

("The Massey Plaintiff's sole argument in support of their motion for summary judgment is that they are identically situated to the petitioner in *Eastern* "), the Plaintiffs simply ig-

nored this warning and proceeded with a single focus on aligning itself to *Eastern Enterprises*.

Therefore, the Plaintiffs' motion for summary judgment is denied on Counts IV and VI.[18]

### V. The Trustee's Counterclaims

In their motion for summary judgment, the Trustees make the bare assertion that summary judgment is appropriate for their counterclaims as well. However, the Trustees provide no argument or decisional support as to why that may be appropriate. The Trustees presented no argument or evidence supporting their claim for damages incurred as a result of the Plaintiffs' refusal to pay premiums, nor have they supported their claim for injunctive relief to require the Plaintiffs to pay the premiums and to prevent the Plaintiffs from improperly disposing of corporate assets. Therefore, the motion for summary judgment on those counterclaims (Counts II and III) is denied.

■ As to the Trustee's request for a declaratory judgment that the Coal Act is constitutional as applied to the Plaintiffs, that request has been mooted by the disposition of the Plaintiffs' claims. *See United Public Workers of Am. v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) ("For adjudication of constitutional issues concrete legal issues, presented in actual cases, not abstractions are requisite. This is as true of declaratory judgments as any other field.") (internal quotations omitted). To determine whether a declaratory judgment requests presents a justiciable controversy, the court must consider "whether the facts alleged, under all the circumstances, show that there is a sub-

stantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Here, there is no longer a substantial controversy, and, to the extent that there is a controversy, it is not sufficiently immediate or real to warrant adjudication of a constitutional claim. Therefore, upon the resolution of the Plaintiffs' claims, the request for declaratory judgment by the Trustees is denied as moot.

### CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is denied and the Defendant Commissioner's Motion for Summary Judgment is granted. The Trustees' Motion for Summary Judgment on their Counterclaims is denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

18. Although the Defendant Trustees moved for summary judgment on their counterclaim, the Trustees did not seek summary judgment as to the Plaintiffs' claims. Nevertheless, resolution of the Plaintiffs' motion for summary judgment and the Commissioner's motion for summary judgment essentially resolves all issues in this action, thereby rendering the claims directed against the Trustees moot.