DISTRICT 29, UNITED MINE WORKERS OF AMERICA; William A. Allen; Roy Breeding; Thomas E. Davis; Carl S. Heffinger; Paul A. Hunt; Glenn E. Kitts; Albert L. Martin; Richard L. Shrader; Elhieu C. Taylor; Harold Wickline; John Doe; Mary Doe; Douglas M. Boothe; Bobby Demarcey, Plaintiffs,

Patsy Trucking, Incorporated, a corporation, Defendant–Appellee,

Clovis D. Cox, Third Party Defendant–Appellee,

v.

UNITED MINE WORKERS OF AMERICA 1992 BENEFIT PLAN; Michael H. Holland; Marty D. Hudson; Elliot A. Segal; A. Frank Dunham, Trustees, Defendants & Third Party Plaintiffs–Appellants,

Robert C. Wallace, Thomas Connors, Defendants & Third Party Plaintiffs,

and

United Mine Workers of America Combined Benefit Plan; United Mine Workers of America 1974 Benefit Plan and Trust, Defendants,

and

Quality Leasing, Incorporated; Kanawha Transport, Incorporated; Car-Bec Trucking Company; Circle Transport, Incorporated, Third Party Defendants.

No. 98–1215.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1999.

Decided June 3, 1999.

**ARGUED:** Peter Buscemi, Morgan, Lewis & Bockius, L.L.P., Washington, D.C., for Appellants. Erin Magee Condaras, Jackson & Kelly, Charleston, West Virginia, for Appellees. **ON BRIEF:** John R. Mooney, Elizabeth A. Saindon, Mooney, Green, Baker, Gibson & Saindon, P.C., Washington, D.C.; David W. Allen, Office of the General, UMWA Health and Retirement Funds, Washington, D.C., for Appellants. Daniel L. Stickler, Jackson & Kelly, Charleston, West Virginia, for Appellees.

Before WILKINSON, Chief Judge, and HAMILTON and WILLIAMS, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge HAMILTON and Judge WILLIAMS joined.

## OPINION

WILKINSON, Chief Judge:

Patsy Trucking, Incorporated fraudulently transferred its assets in order to avoid paying its retirees' health benefits. We hold that the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9701 *et seq.*, requires Patsy to provide health benefits for its retired workers. Indeed, Congress enacted the Coal Act to prevent exactly the type of avoidance in which Patsy engaged. We therefore reverse the judgment of the district court and remand for a determination of the extent of liability.

## I.

The Coal Act is the end of a long line of attempts to finance health care benefits for coal workers. After severe labor unrest in the 1940s over coal workers' health care and pension benefits, coal operators and the United Mine Workers of America (UMW) entered into a series of National Bituminous Coal Wage Agreements (NBCWAs) under which the operators agreed to provide workers with health benefits. By the late 1970s the NBCWAs required operators both to maintain individual employer plans to fund benefits for their own retirees, and to contribute to the United Mine Workers of America Health and Retirement Fund (UMW Fund) for "orphaned" retirees—those whose last employer went out of business.

As operators shifted to non-union employees or simply exited the coal industry altogether, the number of orphaned retirees rose rapidly. "A spiral soon developed, with the rising cost of participation leading more employers to withdraw from the plans, resulting in more onerous obligations for those that remained." *Eastern Enterprises v. Apfel*, 524 U.S. 498, ——, 118 S.Ct. 2131, 2140, 141 L.Ed.2d 451 (1998). With coal workers' health benefits again at risk, labor unrest resumed. In 1989 an eleven-month strike against the Pittston Coal Company ended only with the intervention of the Secretary of Labor.

The Secretary then created the Advisory Commission on United Mine Workers of America Retiree Health Benefits to study the question of financing health care benefits for coal workers. Among its recommendations, the Commission stressed that "mechanisms should be enacted to prevent the future dumping of retiree health care costs on the [UMW Fund]." *Davon, Inc. v. Shalala*, 75 F.3d 1114, 1118 (7th Cir. 1996).

Congress responded in 1992 by enacting the Coal Act. In place of the funding mechanisms under the NBCWAs, the Act substituted three vehicles for financing retirees' health benefits. First, the Act created the Combined Fund, which covers those who, as of July 20, 1992, were already receiving benefits under the NBCWAs. 26 U.S.C. § 9703(f). Second, the Act required all employers who maintained individual employer plans as of February 1, 1993, to continue those plans until they are no longer in business. *Id.* § 9711(a)-(b). Finally, the Act created the 1992 Benefit Plan as a "backstop" for those not receiving coverage under the first two mechanisms. *See id.* § 9712; *Holland v. Double G Coal Co.*, 898 F.Supp. 351, 354 (S.D.W.Va.1995). The 1992 Benefit Plan provides coverage for those who would have been eligible under the Combined Fund but for its cut-off date and those whose employers orphan them by going out of business. *See* 26 U.S.C. § 9712(b).

## II.

The above background has special relevance to the situation of Patsy Trucking.

Patsy was located in Bluefield, West Virginia where it hauled coal for and leased equipment to the coal industry. In connection with these operations, Patsy entered into the 1988 National Bituminous Coal Wage Agreement (1988 NBCWA) pursuant to which the company provided health benefits to its retirees. Patsy's obligation under the 1988 NBCWA extended either until the 1988 NBCWA expired on February 1, 1993, or until Patsy was no longer in business, whichever came first. The 1988 NBCWA defined going out of business as leaving the coal industry and being financially unable to provide health benefits for the company's retirees.

In September 1989 Patsy ceased its operations. As of December 31, 1989, Patsy had roughly $639,000 in assets, and the company continued to provide its retirees with health benefits. In April 1991 Clovis Cox, Patsy's president and sole shareholder, mailed a letter to Patsy's eligible retirees informing them that Patsy was no longer financially able to provide them with health benefits. Cox also wrote a letter to the UMW Fund—which would assume responsibility for Patsy's retirees under the 1988 NBCWA—that Patsy was discontinuing benefits. The company, however, continued to provide benefits through 1991; as a result, the UMW Fund did not perform its usual audit to ensure that Patsy had gone out of business as defined by the 1988 NBCWA.

Meanwhile, Cox was taking cash and other tangible assets out of the company. During 1990 Cox induced the company to loan him $323,000, which brought his total indebtedness to the company to just over $330,000. Then in 1991 Cox caused Patsy to sell to him the company's remaining tangible assets. Cox purchased from the company over fifty trucks, tractor-trailers, and other vehicles for $353,000 as well as an office trailer for $13,000 and cattle for $5,000. Cox paid no money for these assets. Instead, Patsy loaned him the purchase price. When balanced against some payments by Cox to Patsy, Cox owed Patsy over $623,000.

In late 1991 and early 1992 Cox finished his dismemberment of Patsy. He caused Patsy to declare two dividends to him—the first for $271,000 and the second for $352,000. These dividends were not in cash; instead, they forgave Patsy's loans to Cox by expunging the loans receivable from Patsy's books. Cox gave Patsy nothing in return. Aside from $512 in its checking account, forgiving the loans left Patsy with no assets.

On June 10, 1992, Cox wrote another letter to Patsy's retirees notifying them that Patsy would no longer provide them with benefits. Cox instructed them to contact the UMW Fund to obtain benefits. On June 30, 1992, Patsy stopped providing coverage for its retirees.

On October 29, 1992, District 29 of the UMW and several of Patsy's eligible retirees brought suit in the United States District Court for the Southern District of West Virginia. They sought benefits under both the 1988 NBCWA and the Coal Act, which became effective shortly before suit was filed. Plaintiffs named as defendants Patsy, the UMW Fund responsible for Patsy's orphaned retirees under the 1988 NBCWA, and the two funds newly minted by the Coal Act—the Combined Fund and the 1992 Benefit Plan. Patsy cross-claimed against the Combined Fund and the 1992 Benefit Plan. Both funds in turn cross-claimed against Patsy, and the Combined Fund filed a third-party complaint against Cox. Everyone disclaimed liability for benefits.

The district court found for the Combined Fund and the 1992 Benefit Plan. With respect to the 1992 Benefit Plan, the court held that Patsy was liable under the Coal Act for its retirees' benefits for the period beginning February 1, 1993, because the company remained in business as of that date. The district court, however, applied the in-business test from the 1988 NBCWA rather than the Coal Act in making that determination.

Patsy appealed the district court's application of the in-business definition from the 1988 NBCWA.[1] This court agreed that the district court applied the wrong test. The proper test, the court held, was the in-business test under section 9701(c)(7) of the Coal Act. The court therefore reversed and remanded for a determination under the Coal Act. *District 29, United Mine Workers of America v. Patsy Trucking, Inc.*, 110 F.3d 59 (4th Cir.1997) (table decision).

After applying the Coal Act's definition, the district court held that it could find Patsy to have been in business only if the court pierced the corporate veil. The court declined to do so and held that Patsy was not liable for its retirees' health care benefits as of February 1, 1993.

Because we believe that Patsy was in business under the Coal Act, we reverse and remand.

### III.

Under the Coal Act, every coal operator who maintained an individual employer plan as of February 1, 1993, must continue to offer such a plan until it is no longer in business. 26 U.S.C. § 9711(a)-(b). The Act employs an expansive definition of in business that includes "conduct[ing] *or deriv[ing] revenue from* any business activity, whether or not in the coal industry." *Id.* § 9701(c)(7) (emphasis added); *see also Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688, 692 (3d Cir.1996) ("The statutory definition of 'in business' is broad, including within its scope not only (1) an entity that 'conducts' business activity, but also (2) one who 'derives revenue' from business activity.").

■ Patsy claims that it ceased hauling coal and leasing equipment to those in the coal industry as of September 1989. As a result, Patsy maintains, it neither conducted business nor derived revenue from any business activity as of that time.

We disagree. When Patsy ceased its operations in 1989 it held over $639,000 in assets. The district court found that Cox, acting in his capacity as Patsy's sole shareholder, was aware that the UMW Fund would not allow Patsy to discontinue benefits until the company no longer possessed sufficient assets to pay for them. Consequently, the company continued to pay through the middle of 1992.

Meanwhile, Cox systematically bled the company of its assets. During 1990 Cox borrowed a total of $323,000 from Patsy, bringing his total indebtedness to the company to $330,000. Then in 1991 Cox directed Patsy to sell him all of the company's tangible assets after loaning him the purchase price. Finally, Cox directed Patsy effectively to forgive all of these loans. In sum, Cox's machinations left him with over $623,000 worth of Patsy's assets and Patsy with $512.

The district court held that these transfers were fraudulent. In making this determination, the district court looked to general fraudulent transfer principles as embodied in West Virginia's version of the Uniform Fraudulent Transfers Act. W. Va.Code § 40–1A–1 *et seq.* The transfers possessed many of the traditional indicia of fraudulent intent: They were to Cox, Patsy's sole shareholder and therefore the quintessential insider; they consumed nearly all of Patsy's assets; and in the end Patsy received no consideration whatever. *Id.* § 40–1A–4(b)(1), (5), (8). Moreover, the district court made an undisputed finding that Cox knew that under the 1988 NBCWA the UMW Fund would require Patsy to continue to provide health benefits until the company lacked sufficient assets to do so. The district court then found that because Patsy defrauded the UMW Fund—Patsy's initial creditor—the company also defrauded the 1992 Benefit Plan—Patsy's subsequent creditor after the passage of the Coal Act in 1992. *Id.* § 40–1A–4(a). The district court remedied Patsy's fraud by placing the transferred

---

1. Patsy did not appeal the district court's de-

termination as to the Combined Fund.

assets in Patsy's constructive possession. *Id.* § 40–1A–7(a)(1), (3)(iii). Patsy does not appeal these determinations.

■ Despite its finding of fraud, however, the district court held that it could not find Patsy liable for benefits under the Coal Act unless it pierced Patsy's corporate veil. We disagree. The question is not one of veil piercing. Rather, it is whether Patsy's constructively-held assets generated revenue from any business activity as of and after February 1, 1993. It is apparent from the record that they did; indeed, these transferred assets generated revenue some time after that date.

■ For instance, at the same time Cox "purchased" Patsy's tangible assets, he formed a second contract hauling and truck rental business, again as a sole proprietorship. This second hauling and rental business claimed Patsy's vehicles as its own and simultaneously generated substantial revenues. In 1991, 1992, and 1993, the company depreciated Patsy's vehicles as business deductions in the amounts of $37,000, $74,000, and $68,000, respectively. And during the years 1991, 1992, 1993, and 1994 the company generated $306,000, $314,000, $286,000, and $62,000 in gross income, respectively. Finally, in 1994 the company auctioned most of Patsy's vehicles for $248,000. Those assets both indirectly and directly generated revenue from business activity, and Patsy was thus in business under the Coal Act.[2]

■ To hold otherwise would eviscerate the Act. In passing the Act, Congress sought to solve the problem that "too many beneficiaries under the industry-wide health benefit plan [were the responsibility of] too few contributing employers." *Davon,* 75 F.3d at 1116. If we condoned Patsy's behavior in this case, we would reward Patsy for its fraud, and we would create a blueprint for those wishing to shift responsibilities from themselves to the 1992 Benefit Plan. And because the 1992 Benefit Plan is a multiemployer plan, that burden would rest squarely on the shoulders of those employers who continue to play by the rules—the precise result Congress sought to avoid.[3]

## IV.

This case concerns nothing more than Patsy's fraudulent attempt to impoverish itself. Believing that under the 1988 NBCWA Patsy would continue to be responsible for the health benefits of its retirees as long as the company had assets, Cox, its sole shareholder, spirited those assets away. He did so with the obvious intent that Patsy orphan its retirees and shift the cost of their benefits to others. Because Patsy's assets remained in Patsy's constructive possession and continued to generate revenue from business activity, however, Patsy remained liable under the Coal Act.

The district court must thus enter judgment in favor of the 1992 Benefit Plan. While the assets were still constructively

---

**2.** Patsy maintains that the 1994 auction of its vehicles constituted a liquidation and as such was not business activity under the Coal Act. *See In re Carpentertown Coal & Coke Co.,* 166 B.R. 279 (Bankr.W.D.Pa.1994). Even assuming that the hauling and rental company's sale of Patsy's assets was a liquidation, such a sale was business activity under the Coal Act. Although the Coal Act does not provide a specific definition of business activity, a plain reading of the term would include any activity connected with conducting the affairs of a business enterprise. And as we have indicated, the auction was only one of many activities meeting the Coal Act's definition.

**3.** The 1992 Benefit Plan also suggests that we might find Patsy liable by piercing its corporate veil or through its related persons—other closely related business enterprises—under the Coal Act, 26 U.S.C. § 9711(a) (The last signatory operator otherwise liable as of February 1, 1993, "shall continue to provide health benefits coverage . . . for as long as the last signatory operator (*and any related person* ) remains in business." (emphasis added)). Because we hold that Patsy is liable as a result of its fraudulent transfers and retains constructive possession of all assets, we do not reach these issues.

possessed by Patsy, the assets were actually possessed by Cox for the benefit of Patsy, and therefore, the district court erred in failing to hold Patsy and Cox responsible for the health benefits of Patsy's retirees after February 1, 1993. In so holding, the district court necessarily left unaddressed the extent of their liability. We therefore remand for such a determination.[4]

*REVERSED AND REMANDED.*

4. Patsy argues that the amount of its liability is limited to the amount of its fraud. The fraud, however, relates to whether Patsy was in business under the Coal Act, not to the extent of its liability.