WHEELING–PITTSBURGH STEEL
CORPORATION and W–P Coal,
Plaintiffs,

v.

Jo Anne B. BARNHART, Commis-
sioner, Social Security Admin-
istration, Defendant.

No. CIV.A.5:99–CV–60.

United States District Court,
N.D. West Virginia.

March 29, 2002.

Forest H. Roles, Mark E. Heath, Heenan, Althen & Roles, Charleston, WV, John R. Woodrum. Margaret S. Lopez, Heenan, Althen & Roles, Washington, DC, for plaintiffs.

Patrick M. Flatley, AUSA, U.S. Atty., Wheeling, WV, Richard G. Lepley, David W. Ogden, Youngje Lee, Joshua Z. Rabinovitz, Dept. of Justice, Civ. Div., Fed. Programs Branch, Washington, DC, for defendant.

*MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AS TO COUNTS V AND VII, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS V AND VII, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I, II, III AND XXI AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I, II, III AND XXI*

STAMP, District Judge.

### I.  *Procedural History*

Plaintiffs filed their complaint with this Court on May 20, 1999.  On March 6, 2001, this Court granted plaintiffs' motion to amend the complaint and the first amended complaint was filed.  On May 16, 2001, this Court issued an order granting the parties' joint motion for partial stay and briefing on Count VIII and Counts X through XX of the first amended complaint.  On May 25, 2001, plaintiff filed a motion for partial summary judgment as to Counts I through V, VII and XXI. Defendant responded to plaintiffs' motion and filed its own cross-motion for summary judgment as to those counts.  The cross-motions for summary judgment have been fully briefed by both parties.[1]

After considering the parties' briefs and legal authorities on these issues, this Court finds that as to Counts I, II, III and XXI, plaintiffs' motion for summary judgment must be denied and summary judgment is granted in favor of the defendant as to those counts.  As to Counts V and VII, defendant's motion for summary judgment must be denied and summary judgment is

---

**1.**  On November 1, 2001, this Court granted the parties' joint motion for stay of Count IV of the first amended complaint.  Accordingly, the parties' motions for summary judgment as to Count IV will not be considered at this time.

granted in favor of the plaintiffs as to those counts.

## II. *Facts*

### 1. *The Coal Act*

The Coal Act is a detailed and complex act which has been analyzed by the United States Supreme Court and by the United States Court of Appeals for the Fourth Circuit. This Court will offer a brief history of the Act in this opinion but incorporates by reference the comprehensive analysis of the Act set forth by the Supreme Court in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), and by the United States Court of Appeals for the Fourth Circuit in *A.T. Massey Coal Co., Inc. v. Massanari*, 153 F.Supp.2d 813 (E.D.Va.2001).

The United Mine Workers of America ("UMWA") and coal operators entered into a labor agreement in 1946 which created benefit funds to cover medical expenses for miners and their dependents. At that time, the proceeds from royalties on coal production funded the benefits. In 1950, the National Bituminous Coal Wage Agreement ("NBCWA") created a new fund. This new fund established a set amount of royalties to be used for the benefits. Subsequently, the Employee Retirement Income Security Act of 1974 ("ERISA") was enacted and, to comply with the Act, the UMWA and the Bituminous Coal Operators Association entered into a 1974 NBCWA. That agreement continued the coal operators' obligation to contribute fixed amounts of royalties for retiree benefits but the employers' liability did not extend beyond the term of the agreement.

This increase in benefits along with other factors created financial problems for the 1950 and 1974 plans. In response to the difficulty, the 1978 wage agreement obligated signatories to make sufficient contributions to maintain benefits as long as they were in the coal business. The plans continued to suffer financially and employers began to withdraw from the plans. This left those coal operators who remained to absorb the cost of covering retirees who were "orphaned."

In 1992, Congress passed the Coal Industry Retiree Health Benefits Act ("Coal Act"). That Act was aimed at identifying coal operators who were most responsible for the benefits of retirees and assigning the obligation of funding such benefits. The Coal Act merged the 1950 and 1974 plans into a new plan known as the United Mine Workers of America Combined Benefit Fund ("Combined Fund"). The Combined Fund is financed by premiums assessed against coal operators that signed any NBCWA or any other agreement requiring contributions to the 1950 or 1974 benefit plans. A signatory operator who is still in business is liable for the premiums but where a signatory is no longer in business, premiums may be assessed against persons related to the signatory. *See* 26 U.S.C. §§ 9706(a), 9701(c)(2)(A) and (7). It is the duty of the Commissioner of the Social Security Administration ("SSA") to calculate the premiums owed by each signatory operator based on the following formula:

> [T]he Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
>
> (1) First, to the signatory operator which
>
> > (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
> >
> > (B) was the most recent signatory operator to employee the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

Section 9704(a) requires that each assigned operator pay to the Combined Fund an annual premium for each assigned retiree and their dependents. It further provides that "[a]ny related person with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator." 26 U.S.C. § 9704(a).

As noted, if the first priority signatory operator was not "in business" at the time of the assignment, the SSA is to determine if any person "related" to the signatory operator remained in business, provided, however, that the person must have been related to the signatory operator "as of July 20, 1992, except that if, on July 20, 1992, a signatory operator is no longer in business, the relationships shall be determined as of the time immediately before such operator ceased to be in business." 26 U.S.C. § 9701(c)(2)(B). "Related persons" is defined as follows:

(2) Related persons. (A) In general. A person shall be considered to be a related person to a signatory operator if that person is—

(i) a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;

(ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii).

26 U.S.C. § 9701(c)(2)(A). A person is "in business" for purposes of the Coal Act "if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7).

If, in the final analysis, the SSA could not identify a signatory operator or related person still in business under the criteria in § 9706(a)(i)-(iii), the miner remained unassigned. To cover the cost of benefits for unassigned miners, Congress authorized annual transfer payments to be made from the Abandoned Mine Land Reclamation ("AML") Fund to the Combined Fund. *See* 26 U.S.C. § 9705(b); 30 U.S.C. § 1232(h). Should the AML Fund prove insufficient to cover these costs, the Coal Act provides that assigned operators will make up the difference on a pro rata basis. *See* 26 U.S.C. § 9704(d).

## 2. *Eastern Enterprises v. Apfel*

The Supreme Court of the United States was presented with the question of the constitutionality of the Coal Act in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). The case produced a plurality opinion in which five justices agreed that the Coal Act, as

applied to Eastern Enterprises, was unconstitutional, though they did so for different reasons. Four justices found that the Coal Act, as applied to Eastern Enterprises, was constitutional.

In that case, the plaintiffs were assigned retirees for whose benefits they were responsible. *Eastern Enterprises,* 524 U.S. 498, 118 S.Ct. 2131. Eastern Enterprises was involved in coal mining operations until 1965. and was a signatory to each NBCWA executed between 1947 and 1964. *See id.* at 516, 118 S.Ct. 2131. In 1963, Eastern Enterprises transferred all coal-related operations to Eastern Associated Coal Company ("EACC"), a subsidiary. *See id.* Eastern Enterprises retained its stock in EACC and received dividends through a subsidiary, Coal Properties Corporation ("CPC"), until 1987. *See id.* At that point, Eastern Enterprises sold all of its interests in CPC to Peabody Holding Company, Inc. ("Peabody"). *See id.* Under the transfer agreement, Peabody, CPC and EACC all assumed responsibility for payments to benefit plans. *See Eastern Enterprises,* 524 U.S. at 516, 118 S.Ct. 2131. Subsequent to the enactment of the Coal Act, the Commissioner of the SSA assigned several retired miners who had worked for the company prior to 1966 to Eastern Enterprises, imposing upon Eastern Enterprises the obligation of paying the premiums for those retired miners. *See id.* Eastern Enterprises challenged the assignment arguing that the Coal Act violated substantive due process as well as the takings clause of the Fifth Amendment. *See id.* The district court granted summary judgment for the respondents holding that the Coal Act is constitutional and the First Circuit affirmed. *See id.* The Supreme Court reversed. *See id.*

Four justices in the plurality opinion held that the Coal Act did constitute an unconstitutional taking in violation of the Fifth Amendment. *See Eastern Enter-* *prises,* 524 U.S. 498, 118 S.Ct. 2131. Those justices found that the Coal Act "places a severe, disproportionate, and extremely retroactive burden on Eastern" and found a violation of the takings clause. *Id.* at 538, 118 S.Ct. 2131. Five justices, however, found that the Coal Act's imposition of liabilities does not constitute an unconstitutional taking. *See id.* at 550, 118 S.Ct. 2131. Justice Kennedy concurred in the judgment of the plurality but dissented in part finding that, although the Coal Act did not constitute a taking, it did violate substantive due process. *See id.* at 539–50, 118 S.Ct. 2131. The remaining four justices found that the Coal Act violated neither the takings clause nor substantive due process and upheld the constitutionality of the Coal Act. *See id.* at 550, 118 S.Ct. 2131.

### 3. *Wheeling–Pittsburgh Steel Corporation*

Plaintiffs are Wheeling–Pittsburgh Steel Corporation ("WPSC") and W–P Coal Company ("W–P"). Both companies seek an order vacating the assignment of certain UMWA Combined Fund beneficiaries by the SSA to plaintiffs under the Coal Act. The history of the companies is complicated and will be set forth in general terms. WPSC is a Delaware corporation and was incorporated in 1990. Since that time, it has been a wholly-owned subsidiary of Wheeling–Pittsburgh Corporation ("WPC"). In 1968, Wheeling Steel Corporation merged with Pittsburgh Steel Corporation and changed its name to Wheeling–Pittsburgh Steel Corporation, which company the plaintiffs refer to as "Old WPSC." In 1985, Old WPSC filed Chapter 11 bankruptcy from which it emerged in 1991. During the course of the bankruptcy reorganization, Old WPSC changed its name to "Wheeling–Pittsburgh Corporation" and became a holding company. At the same time, a new corporation, the cur-

rent WPSC and plaintiff, was created. It was a wholly-owned subsidiary and operating arm of WPSC.

Plaintiff W–P is a West Virginia corporation incorporated in 1973. It is a wholly-owned subsidiary of Consumers Mining Company ("Consumers"), which is a wholly-owned subsidiary of WPC, as well as a sister corporation to WPSC.

Wheeling Steel Corporation was a signatory to UMWA wage agreements between July 1, 1937 and September 19, 1952. Old WPSC was signatory to UMWA wage agreements between January 27, 1969 and July 17, 1973. In 1973, Old WPSC ceased all coal mining activities and transferred its remaining coal mining operations to W–P. W–P was a signatory to UMWA wage agreements between July 17, 1973 and October 14, 1993 when it sold its coal mining operations to an unrelated third party. Consumers was a signatory to UMWA wage agreements between March 1, 1934 and December 26, 1953 when it ceased coal mining operations.

In response to the *Eastern Enterprises* decision, the SSA Commissioner voided assignments made to coal operators if the operators or persons related to them had ceased to be signatories to a UMWA wage agreement prior to the 1974 agreement. At the same time, the Commissioner concluded that, for an assigned company that was also part of a controlled group of corporations which included other members that had signed post–1974 agreement promising lifetime health benefits, any assignments to that company would be different from those at issue in *Eastern Enterprises* and thus should be sustained. Plaintiffs are alleging that the Commissioner should have voided assignments made to WPSC which were based on the beneficiaries' employment with pre–1974 signatories, Old WPSC and Consumers.

Plaintiffs allege that they were assigned beneficiaries which assignments should be voided in response to the *Eastern Enterprises* decision. Plaintiffs allege that the Commissioner attributed W–P's signing of the 1974 wage agreement to Old WPSC and Consumers which imposes an extreme retroactive burden. Some retirees were assigned to WPSC based on the retirees having worked for Old WPSC and some were assigned based on their having worked for Consumers. The plaintiffs do not dispute that WP, Consumers and WPSC are related persons under the Coal Act. What plaintiffs are contending, though, is that because neither Old WPSC nor Consumers signed a post–1974 wage agreement, these assignments are void because of the *Eastern Enterprises* decision.

Plaintiffs bring several causes of action of which six are at issue in the cross-motions for summary judgment.[2] In Count I, the plaintiffs seek a declaration that the assignments made to WPSC based on employment with Old WPSC or Consumers violates the due process clause of the United States Constitution. Count II seeks a declaration that assignments made to WPSC based on employment with Old WPSC or Consumers violates the takings clause of the United States Constitution. In Count III, plaintiffs seek a declaration that assignments made to WPSC based on employment with Old WPSC or Consumers violates the Administrative Procedures Act ("APA"). Count V seeks a declaration that WPSC is not a "related person" to Gateway Coal Corporation ("Gateway") under the Coal Act. In Count VII, plaintiffs seek a declaration that WPSC and W–P are not "related persons" to Harmar Coal Company ("Harmar") under the Coal Act. Finally, in Count XXI, plaintiffs seek a declaration that the Commissioner of the SSA may not assign to

---

**2.** The counts at issue include Counts I, II, III, V, VII, and XXI.

WPSC beneficiaries whose assignments were voided as a result of the *Eastern Enterprises* decision. Plaintiffs also seek an order directing the Commissioner to withdraw assignments at issue and notify the Combined Fund that those assignments have been withdrawn.

### III. *Legal Standards*

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, as the United States Supreme Court noted in *Anderson,* "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256, 106 S.Ct. 2505. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505; *see also Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950))).

In *Celotex,* the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. *See Oksanen v. Page Mem'l Hosp.,* 912 F.2d 73, 78 (4th Cir. 1990). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In this case, no factual disputes exist. The disputes between the parties center around the application of the law to the facts.

### IV. *Discussion*

#### A. *Constitutional Challenges*

##### 1. *The Takings Clause*

Plaintiffs argue that the assignments made to WPSC based on employment with its subsidiaries, Old WPSC, Consumers and W–P, constitutes an unconstitutional taking in violation of the Fifth Amendment. As mentioned above, the holding in *Eastern Enterprises* was a plurality decision and the majority of justices found that the Coal Act did not constitute an unconstitutional taking. *See A.T. Massey Coal Co., Inc. v. Massanari,* 153 F.Supp.2d 813

(E.D.Va.2001); *see also Holland v. Big River Minerals Corp.*, 181 F.3d 597, 606 (4th Cir.1999). As the Fourth Circuit noted in *Big River*,

> five justices rejected the conclusion that an unconstitutional taking was effected, reasoning that the constitutionality of the financial burden on the company imposed by the Coal Act must be considered as a question of substantive due process rather than as a takings question because no identifiable property interest was infringed by the legislation.

*Big River*, 181 F.3d at 606. The Fourth Circuit thus concluded that "to the extent *Eastern Enterprises* worked any change with respect to takings jurisprudence, that change was not favorable to" parties in that case which had failed to raise a takings claim in a timely manner. *Id.*

The Fourth Circuit has held that *Eastern Enterprises* does not support a holding that the Coal Act violates the takings clause of the Fifth Amendment. Furthermore, it is clear that a majority of the Justices of the United States Supreme Court did not make such a finding in *Eastern Enterprises*. Thus, plaintiffs' motion for summary judgment on Count II in their first amended complaint must be DENIED and summary judgment is GRANTED in favor of the Commissioner on Count II.

### 2. *Substantive Due Process*

In Count I of their first amended complaint, plaintiffs seek a declaration that assignments made to WPSC based on employment with Old WPSC or Consumers is in violation of the due process clause of the United States Constitution. Justice O'Connor's plurality opinion in *Eastern Enterprises* does not hold that the Coal Act constitutes an unconstitutional violation of substantive due process. *Eastern Enterprises*, 524 U.S. at 538, 118 S.Ct. 2131 ("because we have determined that

the third tier of the Coal Act's allocation scheme violates the takings clause as applied to Eastern, we need not address Eastern's due process claim."). Justice Kennedy, in his concurrence, held that the Coal Act does violate substantive due process principles. *See id.* at 539, 118 S.Ct. 2131. The remaining justices held that "whether the provision in question is analyzed under the takings clause or the due process clause, Eastern has not carried its burden of overcoming the presumption of constitutionality accorded to an act of Congress." *Id.* at 553, 118 S.Ct. 2131.

Plaintiffs contend that if they are positioned in a substantially identical position to Eastern Enterprises, then lower courts are bound by the result of the *Eastern Enterprises* decision. Plaintiffs rely on a Third Circuit case for the proposition that, although no one opinion commanded a majority in *Eastern Enterprises*, "lower courts are bound by the result as applied to 'substantially identical' cases." *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 659 (3d Cir.1999). Plaintiffs contend that they are substantially identical to Eastern Enterprises and that the conclusion that the Coal Act is unconstitutional as applied to them is compelled by the *Eastern Enterprises* decision because, like Eastern Enterprises, neither Old WPSC nor Consumers signed any wage agreement promising lifetime health benefits. Thus, plaintiffs contend, just as the assessment of premiums against Eastern Enterprises was found to be unconstitutional, so are the premiums assessed against plaintiffs.

The Commissioner agrees that, according to the *Eastern Enterprises* decision, where neither the original employer nor any related persons to the original employer signed the 1974 wage agreement or any later agreement, the assignment was unconstitutional according to *Eastern Enterprises*. The Commissioner argues that

plaintiffs in this case are distinguishable from Eastern Enterprises because plaintiffs are part of a controlled group of corporations with members that did sign post–1974 wage agreements. The Commissioner contends that Eastern Enterprises was not statutorily related to another company that had signed a 1974 or later wage agreement and the *Eastern Enterprises* case did not address the circumstance where the assignee was related to both the original employer and one who signed a 1974 or later wage agreement. According to the Commissioner, *Eastern Enterprises* did not address imposing liability on "related persons" pursuant to the Coal Act. The Commissioner contends that WPSC, Old WPSC and Consumers are related to W–P. Furthermore, W–P signed wage agreements between 1973 and 1993.

In addressing a similar argument, the Eastern District of Virginia noted that "[t]he assessment begins with an understanding of the principle that: [w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Massey*, 153 F.Supp.2d at 825–26 (quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)). The Eastern District of Virginia noted that in some Supreme Court decisions there will be several approaches which are all different. *See Massey*, 153 F.Supp.2d at 825–26 (citing *Rappa v. New Castle County*, 18 F.3d 1043, 1058 (3d Cir. 1994)). In *Eastern*, no one approach received a majority vote from members of the court. "Those courts considering the scope of the splintered decision in *Eastern Enterprises* unanimously have concluded that '*Eastern* ... mandates judgment for the plaintiffs only if they stand in a *substantially identical* position to Eastern Enterprises with respect to both the plu-

rality and Justice Kennedy's concurrence.' " *Id.* at 826–27 (emphasis in original) (quoting *Unity*, 178 F.3d at 659).

■ In this case, this Court finds that plaintiffs are not substantially identical to Eastern Enterprises so as to bind this Court by the result of the Supreme Court's decision in *Eastern Enterprises*. Both parties agree that *Eastern Enterprises* is controlling only to the extent that the plaintiffs stand in a substantially identical position to Eastern Enterprises. The Supreme Court specifically noted that "Eastern's liability under the Act bears no relationship to its ownership of EACC; the Act assigns Eastern responsibility for benefits relating to miners that Eastern itself, not EACC, employed ...." *Eastern Enterprises*, 524 U.S. at 530, 118 S.Ct. 2131. Thus, Eastern Enterprises was assigned liability for benefits relating to miners that Eastern itself employed. In this case, plaintiffs have been assigned liability for benefits because of its related person status. Such was not the case in *Eastern Enterprises*. The same was true in *Massey* where the Eastern District of Virginia noted that "*Eastern Enterprises* did not, in any fashion, address the constitutionality or the liability of 'related persons' under the Coal Act." *Massey*, 153 F.Supp.2d at 827. The Fourth Circuit made the same determination in *Big River*, 181 F.3d at 606 ("*Eastern Enterprises* did not address whether the Coal Act violated the due process rights of members of a controlled group of signatories to NBCWA's promise of lifetime health benefits for retired miners."). The Fourth Circuit has said that the *Eastern Enterprises* opinion could

only be viewed as rendering the decision that Congress acted arbitrarily in imposing retroactive liability on a signatory to NBCWAs in existence prior to those that promised lifetime health benefits to retired miners when that signatory

made no promise of lifetime benefits, did not contribute to the problem that caused the funding shortfall for the promised lifetime benefits or to the need for such benefits, and was not put on notice by any governmental action during the relevant time period that it might to subjected to later liability.

*Id.*

In *Eastern Enterprises*, the issue was not whether a related person who is assigned liability for premiums under the Coal Act can be so charged in accordance with the Constitution. Rather, *Eastern Enterprises* did not address related person status. The case merely held that an assignment to a company in a substantially identical situation as Eastern Enterprises, one that did not promise lifetime health benefits and one that is not a related person to one who made such a promise, was unconstitutional. Thus, this Court finds that the plaintiffs do not stand in a position substantially identical to that of Eastern Enterprises and, therefore, finds that the holding of *Eastern Enterprises* is not applicable in this case.

█ Regardless of whether plaintiffs are substantially identical to Eastern Enterprises, plaintiffs argue that the Coal Act as applied to them violates substantive due process as it is irrational and fundamentally unfair because it imposes a harsh retroactive economic burden on plaintiffs who never offered lifetime benefits to their employees. The Commissioner contends that, regardless of the *Eastern Enterprises* decision, Congress' decision to treat commonly controlled groups as single employers is a rational response and not impermissibly retroactive.

█ The Fourth Circuit has noted that "it is difficult to exaggerate the burden that appellants must overcome to carry the day on" the argument that the Coal Act violates the Fifth Amendment. *Holland v. Keenan Trucking Co.*, 102 F.3d 736, 740 (4th Cir.1996). The Fourth Circuit has called the Coal Act " 'a classic example of an economic regulation—a legislative effort to structure and accommodate the burdens and benefits of economic life.' " *Id.* (quoting *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). Legislation that is within the core of Congress's commerce power to regulate economic matters "carries a heavy presumption of validity." *Keenan Trucking*, 102 F.3d at 740. The test of validity places a substantial burden on one challenging economic regulations. "If a piece of economic legislation 'is supported by a legitimate legislative purpose furthered by a rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.' " *Id.* (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)).

Plaintiffs contend that to assign beneficiaries to them based on their related person status violates their rights to substantive due process. The Fourth Circuit rejected the same argument in *Keenan Trucking*, stating that "the basic test remains the same regardless of the 'retroactive nature' of a statute: whether the statute is rationally related to a legitimate legislative purpose." *Keenan Trucking*, 102 F.3d at 740. The Fourth Circuit noted that it cannot be disputed that the Coal Act was enacted to further a legitimate government purpose as the aim of the Act is " 'to remedy problems with the provision and funding of health care benefits' for retirees in the coal industry." *Id.* at 741 (quoting 26 U.S.C. § 9701). In *Keenan Trucking*, the Fourth Circuit noted the importance of this goal, referencing major strikes and unrest caused by the financial condition of UMWA benefit plans in the late 1980s and early 1990s

and "the importance of coal production to interstate commerce and the potential for severe economic disruption if the funding of health benefits remained unstable ...." *Id.* The Fourth Circuit also held that the Coal Act employs rational means to achieve the purpose. *See id.* Coal operators were direct beneficiaries of their promises to ensure lifetime health benefits to their employees in that those promises helped to ensure quality labor for their business operations. *See id.* Furthermore, the Fourth Circuit has said that "legislation need not place remedial burdens on the 'most responsible' party to survive rational basis scrutiny." *Keenan Trucking,* 102 F.3d at 742.

Thus, the Fourth Circuit has upheld the constitutionality of the Coal Act and this Court is bound by such precedent. This Court finds that the Coal Act serves a legitimate government purpose and that the means employed to achieve the goal at issue is indeed rational. Accordingly, the plaintiffs' motion for summary judgment as to Count I is DENIED and summary judgment is GRANTED in favor of the Commissioner on Count I. Thus, this Court finds that the Coal Act does not violate either the substantive due process clause of the Fifth Amendment nor the takings clause of the Fifth Amendment.

B. *Plaintiffs' APA Claim*

In Count III, plaintiffs seek a declaration that the Commissioner's decision not to void the assignments referenced by Counts I and II is arbitrary and capricious in violation of § 706 of the Administrative Procedures Act ("APA"). Defendants contend that plaintiffs' APA claim adds nothing to their constitutional arguments. This Court agrees that to the extent plaintiffs are arguing that the Commissioner's decisions were not in accordance with the law because the assignments are unconstitutional, the argument adds nothing to the constitutional issues addressed above.

Having found that the Coal Act is constitutional and having found that plaintiffs do not stand in a substantially identical position as Eastern Enterprises did, the Commissioner's decision is not arbitrary nor is it capricious and it is otherwise in accordance with the law. Accordingly, plaintiffs' motion for summary judgment as to Count III is DENIED and summary judgment is GRANTED in favor of the Commissioner on Count III.

C. *Assignments Based on Related Person Status*

1. *Gateway Corporation*

In Count V of their first amended complaint, plaintiffs seek a declaration that WPSC is not a related person to Gateway Coal Company ("Gateway Corp.") under the Coal Act. WPSC was assigned beneficiaries based on those retirees' employment with Gateway Corp. and based on the contention that WPSC is a related person to Gateway Corp. As this Court understands the points raised by the briefs submitted by the parties, the history of Gateway Corp. is as follows: Old WPSC and Jones & Laughlin Steel Company ("J & L") owned Gateway Corp. Old WPSC held a 25.86% ownership interest in Gateway Corp. while J & L owned a 74.14% interest in the corporation. In 1980, Gateway Corp. dissolved. However, a partnership was then formed between Old WPSC and J & L. This partnership is known as the 1st Gateway Partnership. Both Old WPSC and J & L retained certain ownership in the partnership equal to the amount of ownership each held in Gateway Corp.

The question is whether WPSC is a related person to Gateway Corp. so as to sustain the assignments made to WPSC based on beneficiaries having worked for Gateway Corp. Section 9701(c)(2)(A) of the Coal Act provides three tests for deter-

mining whether an entity is related to a signatory operator. Under these tests, an entity is a related person to a signatory operator if it is (i) a member of a "controlled group" of corporations which includes the signatory operator; (ii) a business under "common control" with the signatory operator; or (iii) a general partner or a joint venturer with a signatory operator. 26 U.S.C. § 9701(c)(2). The parties apparently disagree on which test is to be used to determine related person status in this case. In plaintiffs' motion for summary judgment, they state that "the relevant related person test is the 'controlled group' test." Plaintiffs' Motion for Summary Judgment at 26.[3]

Plaintiffs are correct that if the controlled group test is the relevant test to determine related person status in this case then they should not have been assigned beneficiaries based on related person status as they owned less than 50% interest in Gateway Corp. For purposes of related person status between members of a controlled group, one must look to 26 U.S.C. § 52(a) to determine the meaning of a member of a controlled group. 26 U.S.C. § 52(a) states that a member of a controlled group must have more than a 50% ownership interest in the corporation. As plaintiffs point out, Old WPSC held just slightly more than 25% of shares in Gateway Corp.

Defendant contends that it is the third test that is applicable here, that being that a related person includes any person identified as having a partnership interest with the signatory operator. The Commissioner contends that the SSA could have found either partner, Old WPSC or J & L, to be the related person to the 1st Gateway Partnership and that percentages of ownership are only relevant to the controlled group test. The defendant admits that the Commissioner had information indicating that J & L had gone out of the business by the date for making assignment determinations and, thus, only Old WPSC was available for assignment.

This Court finds that if the controlled group test is the proper test to determine related person status between WPSC and Gateway Corp., the assignments made to WPSC based on beneficiaries' employment with Gateway Corp. are invalid, as Old WPSC never owned more than a 50% interest in Gateway Corp. or in the 1st Gateway Partnership. The Commissioner's argument in response to this is that Gateway Corp. and the 1st Gateway Partnership are actually the same entity reorganized solely to avoid federal tax liability. The defendant's logic appears to be that if Gateway Corp. and the 1st Gateway Partnership are the same entity, then the 1st Gateway Partnership employed the beneficiaries at issue, thus implicating the third test of related person status. If the third test were to be employed, the fact that Old WPSC had a partnership interest with the signatory operator, Gateway Corp., along with the fact that Old WPSC and WPSC are related persons, would mean the assignments are valid.

This Court does not accept defendant's argument. It is elementary that corporations and partnerships are distinct legal entities with distinct legal consequences. "The rights and obligations of a partner are not at all similar to the rights and obligations of a stockholder in a corporation." 59A Am.Jur.2d *Partnership* § 15 (1987). The defendant has provided this Court with no information to controvert

---

3. The defendant states, this Court believes incorrectly, in her cross-motion for summary judgment that "plaintiffs appear to concede that the first two tests for 'related person'

status ... are inapplicable here." Defendant's Cross–Motion for Summary Judgment at 32 n. 20.

these basic legal principles and has not presented evidence, nor even suggested, that the corporation simply decided to become a partnership to avoid liability for the benefits of the corporation's retired employees. Even though the ownership interest in Gateway Corp. and the 1st Gateway Partnership remained the same, it was Gateway Corp. that employed the beneficiaries at issue. Because this Court finds that Gateway Corp. and the 1st Gateway Partnership are not the same entity and that it was not the partnership that employed the beneficiaries, the third test of related person status does not apply. Thus, the "controlled group" test applies and, because Old WPSC's ownership interest in Gateway Corp. never exceeded 50%, Old WPSC is not a related person to Gateway Corp.[4] Accordingly, neither is plaintiff WPSC a related person to Gateway Corp. Consequently, the assignments made to WPSC based on its status as a related person to Gateway Corp. are void. The Commissioner is ORDERED to withdraw such assignments and notify the Combined Fund that such assignments have been withdrawn. Commissioner's motion for summary judgment as to Count V is DENIED and summary judgment is GRANTED in favor of plaintiffs as to Count V.

### 2. Harmar Coal Company

■ In Count VII of their first amended complaint, plaintiffs seek a declaration that assignments made to them based on beneficiaries' employment with Harmar Coal Company ("Harmar") are invalid because WPSC is not a related person to Harmar. Plaintiffs contend that WPSC is not a related person to Harmar under § 9701(c)(2) of the Coal Act because it had no relation-

ship to Harmar at the time specified in the Coal Act for determining related person status.

Harmar was a signatory to coal wage agreements before and after 1978. The company entered Chapter 11 bankruptcy in 1985 at which time Old WPSC owned a 75% interest in Harmar. However, in 1988, while Harmar was still in bankruptcy, Old WPSC surrendered all of its ownership interest in Harmar to Harmar's receiver for the benefit of Harmar's creditors. Plaintiffs contend that after Old WPSC ceased to own any interest in Harmar, Harmar continued to be in business for purposes of the Coal Act.

Plaintiffs claim that just because a company is in bankruptcy does not mean it is not in business under the Coal Act. Plaintiffs contend that Harmar was in business during 1992 and that between 1988 (the time when Old WPSC transferred its ownership interest in Harmar) and 1992, Harmar engaged in several sales transactions in which it sold assets to third parties. Plaintiffs argue that because they had no ownership interest in Harmar immediately before it ceased to do business, the beneficiaries should be assigned to Harmar.

The Commissioner states that it examined the W–2s forms that Harmar submitted to the Internal Revenue Service and determined that Harmar ceased to be in business for Coal Act purposes in 1985. Thus, the Commissioner argues, the SSA looked at related person status immediately before Harmar ceased doing business. Immediately before 1985, Old WPSC had an ownership interest in Harmar. Thus, the Commissioner argues, Old WPSC was

---

**4.** The plaintiffs argue that the 1st Gateway Partnership is actually a successor-in-interest to Gateway Corp. As such, that is further grounds for finding that WPSC is not related to Gateway Corp. The United States Supreme Court has held that successors-in-interest to

out-of-business coal operators that signed wage agreements do not fall within the Coal Act's definition of "related person" to whom retired miners may be assigned. See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908.

a related person to Harmar immediately before it ceased to do business.

The Coal Act dictates that, in determining related person status, the pertinent date is July 20, 1992 and if the signatory operator is no longer in business on that date, the determination is made as of the time immediately before the operator ceased to be in business. *See* 26 U.S.C. § 9701(c)(2)(B). The question here is when did Harmar cease doing business for purposes of the Coal Act. Plaintiffs contend that Harmar was in business as of July 20, 1992 and the determination of a related person should be made with that date in mind. The Commissioner contends that Harmar ceased to be in business for Coal Act purposes in 1985, immediately before which time Old WPSC had an ownership interest in Harmar. Under the Coal Act, "a person shall be considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7). At issue is the broad definition of the term "in business" and the deference to be accorded the Commissioner in determining whether or not a company is "in business."

According to the Fourth Circuit, "the statutory definition of 'in business' is broad, including within its scope not only (1) an entity that 'conducts' business activity, but also (2) one who 'derives revenue' from business activity." *Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688, 692 (3d Cir.1996); *see also District 29, United Mine Workers of America v. United Mine Workers of America 1992 Benefit Plan*, 179 F.3d 141, 145 (4th Cir.1999). In *District 29*, the Fourth Circuit held that, because Patsy Trucking held over $639,000.00 in assets after it ceased operations in 1999, it was nonetheless in business for purposes of the Coal Act after that date. *District 29*, 179 F.3d 141. In *District 29*, Patsy Trucking had made several fraudulent transfers in order to deplete its assets. *See id.* In that case, the Fourth Circuit noted that the question was whether Patsy Trucking's assets generated revenue from business activity as of February 1, 1993.[5] *See id.* Patsy Trucking claimed that it ceased hauling coal and leasing equipment to others in the coal industry in September 1989 and was therefore not in business at the pertinent time. *See id.* The court noted that it was apparent that the assets transferred from Patsy Trucking generated revenue after February 1, 1993. *See id.* The court held that those assets "both indirectly and directly generated revenue from business activity, and Patsy was thus in business under the Coal Act." *District 29*, 179 F.3d at 146.

In this case, there is no allegation of fraud but there is evidence that Harmar continued to generate revenues from the sale of assets until 1992. If this constitutes business activity for purposes of the Coal Act, then plaintiffs would not be responsible for the beneficiaries assigned to them based on their related person status to Harmar.

This Court finds that because the definition of "in business" has been construed broadly in this Circuit, and because Harmar did continue to generate revenues from the sale of assets subsequent to the time the plaintiffs ceased to do business with Harmar, this Court finds that the assignments made to plaintiffs based on their related person status to Harmar should be voided. Accordingly, defendant's motion for summary judgment as to Count VII is DENIED and summary

---

**5.** Under the Coal Act, coal operators who maintained an individual employer plan as of February 1, 1993 must continue to offer that plan until it is no longer in business. *See* 26 U.S.C. § 9711(a) and (b).

judgment is GRANTED in favor of the plaintiffs as to Count VII.

## D. *Commissioner's Application of Eastern Enterprises*

■ In Count XXI of their first amended complaint, plaintiffs seek a declaration that the Commissioner may not assign to WPSC beneficiaries whose assignments to other companies were voided by the *Eastern Enterprises* decision. In response to that decision, the Commissioner voided several assignments that, according to *Eastern Enterprises,* were unconstitutional. The Commissioner then reassigned those beneficiaries to other signatory operators. Plaintiffs argue that it was improper for the Commissioner to assume this legislative function. Plaintiffs do not argue that they are not responsible as a related person for the beneficiaries assigned to them under Count XXI, but merely allege that the Commissioner acted outside the bounds of her authority in reassigning the beneficiaries after the *Eastern Enterprises* decision. Plaintiffs contend that such reassignment was arbitrary, capricious, and not in accordance with the law.

The defendant points out that the Commissioner is tasked with the duty of applying the Coal Act's assignment provisions. *See* 26 U.S.C. § 9706(a). Defendant argues that the reassignments were in keeping with the Coal Act's objective which is to maximize the number of beneficiaries allocated to coal operators (or related persons) most responsible for creating the expectation of lifetime benefits in their former mining employees. Defendant contends that it was reasonable for the Commissioner to attempt to apply § 9706(a)(3) consistently with Congress's intent and to the extent that such application would not conflict with the Constitution as dictated by *Eastern Enterprises.* Defendant asserts that agencies have inherent authority to reconsider their own determinations

within a reasonable time period and that such a decision is not contingent upon whether an applicable statute expressly provides for reconsideration.

■ The Coal Act requires the Commissioner to assign beneficiaries to signatory operators (or their related persons) and then notify the Combined Fund and the operators of such assignments. *See National Mining Ass'n v. Apfel,* 97 F.Supp.2d 1070, 1078 (N.D.Ala.1999). Also, the Commissioner is charged with calculating the pre-beneficiary yearly premium. *See id.* "These are the only two obligations the Commissioner has under the Coal Act." *Id.* Thus, it is clearly the Commissioner's duty to assign beneficiaries to the proper signatories (or their related persons). *See* 26 U.S.C. § 9706(a). This Court believes that it follows that it is also the duty of the Commissioner to reassign any beneficiaries that have been improperly assigned. The Supreme Court, in *Eastern Enterprises,* offered guidance to the Commissioner as to how to make certain assignments. This Court finds that it was not only permissible for the Commissioner to reassign beneficiaries in order to comply with the Supreme Court's ruling, but it was the Commissioner's duty to do so. Furthermore, "[i]t is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review." *Dun & Bradstreet Corp. Found. v. United States Postal Serv.,* 946 F.2d 189, 193 (2d Cir.1991).

This Court finds that the Commissioner had the authority to reassign beneficiaries in response to the *Eastern Enterprises* and, thus, did not act in an arbitrary and capricious manner but, *rather,* acted within the bounds of the law. Accordingly, plaintiffs' motion for summary judgment as to

Count XXI is DENIED and summary judgment is GRANTED in favor of defendant as to Count XXI.

### V. *Conclusion*

For the reasons stated above, defendant's motion for summary judgment as to Counts I, II, III and XXI is hereby GRANTED and plaintiffs' motion for summary judgment as to those counts is hereby DENIED. Plaintiffs' motion for summary judgment as to Counts V and VII is hereby GRANTED and defendant's cross-motion for summary judgment on those counts is hereby DENIED.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit copies of this order to counsel of record herein.